670 F.2d 1188
 27 Fair Empl.Prac.Cas. 1148,
27 Empl. Prac. Dec. P 32,355, 216 U.S.App.D.C. 369,
1 A.D. Cases 298
 Edward N. SHIREY, on Behalf of Himself and All Others
Similarly Situated, Appellant,
v.
Donald J. DEVINE, Director, Office of Personnel Management,
Individually and in His Official Capacity, et al.
 No. 80-2532.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Oct. 13, 1981.
Decided Jan. 8, 1982.
 
 Andrew S. Penn and Larry J. Goldberg, Washington, D. C., with whom Seymour DuBow, Washington, D. C., was on the brief, for appellant.
 Scott T. Kragie, Asst. U. S. Atty., Washington, D. C., with whom Charles F. C. Ruff, U. S. Atty., and Royce C. Lamberth and Kenneth M. Raisler, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellees.
 Before WRIGHT, TAMM, and EDWARDS, Circuit Judges.
 Opinion for the court filed by Circuit Judge J. SKELLY WRIGHT.
 Dissenting opinion filed by Circuit Judge TAMM.
 J. SKELLY WRIGHT, Circuit Judge:
 
 
 1
 This case presents our first opportunity to reach the merits of a federal employee's claim that he suffered employment discrimination on the basis of a severe physical disability.[1] We hold that permanent denial of the job tenure protections afforded other employees solely because of an employee's handicap violates Section 501 of the Rehabilitation Act of 1973, 29 U.S.C. § 791(b) (1976).
 
 
 2
 When Edward Shirey graduated from college in 1973 with a Bachelor of Science degree in business administration, he applied for an entry-level position as a computer systems analyst at the Goddard Space Flight Center, run by the National Aeronautics and Space Administration (NASA). Mr. Shirey is deaf, and officials at Goddard applied to the Civil Service Commission to "except" the position he would fill from normal competitive appointment processes.[2] Upon receipt of Commission approval and certification of Mr. Shirey's ability to do the tasks required for his job, in August 1973 Goddard hired Mr. Shirey as a trainee, on a nine-month probation trial. For the next four and a half years Mr. Shirey worked alongside nonhandicapped analysts and mathematicians in Goddard's Management Systems Office. The record attests to his success on the job: he successfully completed his probation period and received a promotion shortly thereafter; his superiors wrote letters praising both his work as an analyst and the special efforts he made to help his hearing colleagues learn to work with him. Apart from teaching Mr. Shirey's co-workers some manual communication skills and making sure that Mr. Shirey would not have to work alone, Goddard incurred no extra expense because of Mr. Shirey's inability to hear.[3]
 
 
 3
 In October 1977 NASA announced a reduction-in-force, beginning January 20, 1978, which would abolish Mr. Shirey's position along with 82 other positions at Goddard. Goddard employees who had been appointed to their positions through the competitive process had a number of job protection rights. They could "bump" employees with lower retention status from jobs that had not been abolished, and they received re-employment priority rights.[4] Mr. Shirey had completely different-and inferior-job protection rights, because he had been "excepted" from the competitive appointment process.[5] Unlike other members of his work group, who were able to find other positions at Goddard, Mr. Shirey was separated from the agency. He sought other employment in the federal government, but was unable to obtain any for two years.
 
 
 4
 After an unsuccessful administrative appeal,[6] Mr. Shirey brought suit in the District Court against responsible officials of the Civil Service Commission (now the Office of Personnel Management), NASA, and Goddard. He claimed that NASA's employment system, which denied him meaningful job tenure protections and promotion opportunities afforded other employees, violated the Veteran's Preference Act, 5 U.S.C. § 3502 (1976), the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 791 et seq. (1976 & Supp. III 1979), and the Fifth Amendment's due process and equal protection guarantees. Although it held that Mr. Shirey had a cause of action to enforce Sections 501, 504, and 505 of the Rehabilitation Act, 29 U.S.C. §§ 791, 794, 794a (1976 & Supp. III 1979), the District Court granted summary judgment for the government defendants on all counts. Because we disagree with the District Court as to the substantive scope of the Rehabilitation Act's guarantee of affirmative action for the handicapped in federal government employment, we reverse.[7]
 
 
 5
 I. Federal Employment of the Severely Disabled
 
 
 6
 The principal question at issue in this case is whether the Rehabilitation Act of 1973 requires the federal government to cease any discrimination against qualified handicapped employees. Our effort to resolve this question is complicated somewhat by the fact that Mr. Shirey's troubles were entirely due to the features of an administrative program under which he was hired, a program designed to promote federal employment for handicapped persons.
 
 
 7
 The government program under which Mr. Shirey was hired predated the Rehabilitation Act, and for many years it was the most important element in federal efforts to hire the handicapped. But the Rehabilitation Act of 1973 represented a powerful congressional initiative which, to a large extent, eclipsed and supplanted the prior efforts of the civil service authorities. The following sections of this opinion demonstrate, however, that those authorities have been slow to alter their programs in response to the new law. As a result, the program under which Mr. Shirey was hired (and which governed the conditions of his employment) failed to meet all the requirements of the Rehabilitation Act.
 
 A. Administrative Program: Subsection (u)
 
 8
 The program under which Mr. Shirey was hired began as an administrative experiment in 1964, and its structure was largely shaped by the overall structure of the federal employment system. Civil service positions are divided into two categories: competitive service positions and positions excepted from the competitive service. 5 U.S.C. §§ 2102-2103 (1976 & Supp. III 1979).[8] Congress has excepted some positions from the competitive service by statute[9]; others are excepted because they require Senate confirmation of appointees.[10] Furthermore, the President may prescribe rules for "necessary exceptions of positions from the competitive service(.)" Id. § 3302(1) (1976). The President, in turn, has delegated this authority to the Civil Service Commission and its successor, the Office of Personnel Management. Executive Order No. 10577, Rule VI, 3 C.F.R. 222 (1954-1958 Comp.), reprinted as amended, 5 U.S.C. § 3301 app. at 375 (1976).
 
 
 9
 Pursuant to the President's delegation of authority, the Civil Service Commission created a large number of excepted positions over the course of the years, linked principally by its determination that it would not be "practicable" to fill them by competitive processes.[11] In 1964 the Commission included among these an experimental exception for positions filled by persons with severe physical handicaps. 29 Fed.Reg. 498 (1964) (codified at 5 C.F.R. § 213.3102(u)); cf. 28 Fed.Reg. 10327 (1963) (codified at 5 C.F.R. § 213.3102(t)) (mentally retarded persons). Three years later the Commission made these authorities permanent, and it removed numerical limits on the number of positions agencies could fill with physically disabled or mentally retarded persons. 32 Fed.Reg. 10635 (1967).
 
 
 10
 Subsections (t) and (u) are only two of many authorities for filling positions outside of the competitive service. Many of these identify jobs wholly different in character from those performed by competitive service employees[12] or specialized part-time or seasonal work.[13] Subsections (t) and (u) differ from almost all other excepted service positions because they do not define the type of position to be filled, only the medical condition of the employee.[14] Subject to approval by the central civil service authority, see 5 C.F.R. § 213.102 (1981), any position in the civil service could be "excepted" for a handicapped person, regardless of the job duties, so long as the appointee was qualified to perform them.[15]
 
 
 11
 In July 1969 the Civil Service Commission launched on its own initiative a program to promote what it called "selective placement," or "the careful matching of the abilities of the handicapped persons with the duties of particular positions." Federal Personnel Manual 306-3 (July 1969). As part of this program the Commission attempted to educate federal employers about the usefulness of subsection (u) authority as a means "to provide for continuing employment of severely handicapped people" by "match(ing) job tasks and work environment to accommodate the particular disabilities of a severely handicapped person." Id. at 306-14 (May 30, 1972). After the Commission began its 1969 campaign, employment of handicapped persons under excepted service authority increased substantially.[16] It was under this program that Mr. Shirey was hired, using subsection (u) to bypass the competitive appointment system.
 
 B. The Rehabilitation Act
 
 12
 The Rehabilitation Act of 1973 was not the first congressional initiative relating to federal employment of the handicapped. In 1948 Congress enacted a strongly worded statute banning discrimination in federal employment,[17] but it was subsequently revised so that by the time Mr. Shirey lost his job it did not apply to his case.[18] The Rehabilitation Act of 1973, however, was the first major federal statute designed to provide assistance to the whole population of handicapped persons. As part of that effort, Title V of the Rehabilitation Act addressed discrimination against the handicapped. Section 501 required all departments and agencies in the Executive Branch to submit to the Civil Service Commission "an affirmative action program plan for the hiring, placement, and advancement of handicapped individuals," which would be approved by the Commission if it offered "sufficient assurances, procedures and commitments" to accomplish the affirmative action goals. 29 U.S.C. § 791(b) (1976).[19]
 
 
 13
 Other sections of the 1973 Act created a board to promote elimination of architectural and transportation barriers in federal, state, and local government facilities, including public housing and other institutions, id. § 792, provided for affirmative action clauses in federal procurement contracts, id. § 793, and prohibited discrimination against any "otherwise qualified handicapped individual" in programs receiving federal financial assistance, id. § 794. The Civil Service Commission did not specifically revise its regulations concerning federal employment of the handicapped when the Rehabilitation Act went into effect. Instead, it designed a model affirmative action plan for federal agencies, see Federal Personnel Manual 306-C-1 et seq. (April 20, 1978), and it also stepped up its efforts to educate responsible federal officials about the special needs of handicapped employees and applicants for employment.[20]
 
 
 14
 In 1978 Congress took a second major initiative in the area of federal employment of the handicapped with a set of amendments to the Rehabilitation Act and other laws affecting the handicapped. Rehabilitation, Comprehensive Services, and Developmental Disabilities Amendments of 1978, Pub.L.No.95-602, 92 Stat. 2955 (1978 Amendments). The most important of these, as far as this case is concerned, is a new Section 505 added to the Rehabilitation Act, stating in part:
 
 
 15
 The remedies, procedures, and rights set forth in section 717 of the Civil Rights Act of 1964 * * *, including the application of sections 706(f) through 706(k) * * *, shall be available, with respect to any complaint under section 791 of this title, to any employee or applicant for employment aggrieved by the final disposition of such complaint, or by the failure to take final action on such complaint. In fashioning an equitable or affirmative action remedy under such section, a court may take into account the reasonableness of the cost of any necessary work place accommodation, and the availability of alternatives therefor or other appropriate relief in order to achieve an equitable and appropriate remedy.
 
 
 16
 29 U.S.C. § 794a(a)(1) (Supp. III 1979). Section 505 also set up a similar relationship between Section 504 of the Rehabilitation Act and Title VI of the Civil Rights Act of 1967, id. § 794a(a)(2), and it provided for attorney fee awards to prevailing parties in actions under both Section 501 and Section 504, id. § 794a(b).[21] As before, the Civil Service Commission did not revise its regulations concerning federal employment of the handicapped in response to the 1978 Amendments.[22]
 
 
 17
 C. Interrelation of the Rehabilitation Act and the Subsection (u) Hiring Program
 
 
 18
 A brief summary of the material discussed in the foregoing sections suffices to highlight the issues raised by this case. Since World War II both Congress and the civil service authorities have pursued laudable efforts to ensure that the federal government provides employment opportunities to the severely handicapped. Nevertheless, the emphases of the programs, and the understanding behind each program of what harm required action, varied from program to program over time. Until the mid-1960's both Congress and the Executive Branch seemed to focus on removing artificial impediments to employment of the handicapped through normal competitive processes. Beginning in 1964, however, the Civil Service Commission increasingly relied on using excepted service authority to place the most severely handicapped in appropriate federal positions. This course of action gave federal employers a great deal of flexibility in matching specific applicants to jobs that they could perform, and it guarded against hidden biases in the competitive examination process.[23] On the other hand, relying on excepted service appointments also operated to deny important job protection and promotion benefits to those handicapped persons who were eventually employed.
 
 
 19
 In 1973 Congress mandated affirmative action for handicapped persons, not only in hiring but also in placement and advancement, throughout the federal government. And, although the original Rehabilitation Act was silent on the matter, the 1978 Congress confirmed that the federal courts as well as civil service authorities should have a role in enforcing its affirmative action guarantee. Furthermore, Congress demonstrated that it perceived discrimination against the handicapped as fundamentally similar to other forms of discrimination-on the basis of race, sex, national origin, or religious belief-addressed in Title VII of the Civil Rights Act of 1964. At the outset nondiscrimination against the handicapped was perhaps seen as merely fair play and good federal policy, a recognition that the disabled had performed valuable services during the war and that handicapped veterans should have a role in postwar society,[24] but by 1978 Congress had made it clear that nondiscrimination was an obligation, not a gratuity.[25]
 
 
 20
 The civil service programs that began in 1969 certainly went a long way toward discharging that obligation. Not only did the government hire more severely handicapped employees, see notes 16 and 18 supra, but it also made important progress in opening up a variety of jobs to the handicapped. A Chain of Cooperation, supra note 16, at 6-7. The affirmative action plans drawn up after 1973 surely deepened federal officials' awareness both of opportunities for employing the handicapped in their departments and of the subtly discriminatory aspects of day-to-day life on the job. Furthermore, the Civil Service Commission's programs show an appreciation for the number of physical and mental conditions that at times exacerbate the effect of physical disabilities.[26] Nevertheless, until 1979 those employees classified as "severely" handicapped and given excepted service appointments had long-range employment prospects and protections significantly different from those of their co-workers in similar or identical jobs. The fact that this aspect of the system was modified in 1979 by Executive Order, see note 22 supra, suggests that we are not alone in suspecting some dissonance between the Rehabilitation Act of 1973 and the pre-existing programs that, in the absence of specific efforts to interpret the statute, bore the burden of implementing it.
 
 
 21
 Mr. Shirey's federal employment occurred during a period of rapid change in the status of the handicapped as federal employees. He was hired shortly before the Rehabilitation Act was first passed and separated shortly before it was amended in 1978. The record does not disclose why he received an excepted service appointment rather than undergoing a competitive examination with special accommodations,[27] but soon after he began working at Goddard NASA instituted an affirmative action plan that relied heavily on subsection (u) appointments to meet its obligation under the Rehabilitation Act.[28] Had Mr. Shirey been more fortunate, perhaps, the reduction-in-force might have come 15 months later, by which time he could have attained full competitive service status under Executive Order 12125, see note 22 supra. However, he was not so fortunate, and thus he presents for our decision the question whether an agency's refusal to provide equal job protection and promotion rights to its severely handicapped employees violated Section 501 of the Rehabilitation Act.
 
 II. Scope of Review
 
 22
 In order to decide whether the Rehabilitation Act made the scheme under which Mr. Shirey lost his job unlawful, we must first address briefly the role of federal courts in enforcing Section 501. As an initial matter, we recognize that Section 501 as it was first enacted did not expressly provide for any involvement by the courts in the affirmative action effort. But even before passage of the 1978 Amendments handicapped federal employees could seek judicial review under the Administrative Procedure Act, 5 U.S.C. §§ 701-706 (1976), of any final administrative action that adversely affected them, and one of the claims they could raise in that posture was that the action violated Section 501. See Ryan v. Federal Deposit Insurance Corp., 565 F.2d 762, 763 (D.C.Cir.1977); McNutt v. Hills, 426 F.Supp. 990 (D.D.C.1977); cf. Rogers v. Frito-Lay, Inc., 611 F.2d 1074, 1080 (5th Cir. 1980) (no private right of action under Section 503, but the handicapped have "the right to petition those who administer federal contracts to perform their duty"). See also Coleman v. Darden, 595 F.2d 533, 539-540 (10th Cir. 1979).
 
 
 23
 Insofar as Section 505 refined and strengthened the remedies available to enforce pre-existing rights, it applies retroactively to proceedings pending at the time it became effective. See Bradley v. Richmond School District, 416 U.S. 696, 711-715, 94 S.Ct. 2006, 2016-18, 40 L.Ed.2d 476 (1974); Sampeyreac v. United States, 32 U.S. (7 Pet.) 222, 239, 8 L.Ed. 665 (1833); cf., e.g., Trageser v. Libbie Rehabilitation Center, Inc., 590 F.2d 87, 88 (4th Cir. 1978) (applying Section 505 retroactively to an action under Section 504). Section 505's incorporation of Section 717 of Title VII provides further reason to hold that the procedural aspects of Section 505 apply retroactively, because we reached the same conclusion about Section 717 after it was enacted in 1972. See Womack v. Lynn, 504 F.2d 267, 269 (D.C.Cir.1974). For these reasons the District Court held, and we agree, that since Mr. Shirey had exhausted his administrative remedies as contemplated by Section 505, since his claim was pending when Section 505 became effective,[29] and since he met the 30-day time requirement in Section 505 for filing suit after denial of an administrative complaint, he is entitled to have his case considered according to the procedural and remedial scheme of Section 505. See Memorandum Opinion of the District Court at 7-8 (App., supra note 3, at 12a-13a).[30]
 
 
 24
 Section 505 might certainly have been drafted so as to make its reconciliation with Section 501 an easier task, but an honest attempt to interpret the two statutes together helps define some procedural aspects of Section 501 cases. First, the District Courts must conduct trials de novo on claims of discrimination on the basis of handicap in government employment. When Section 717 was passed we made an extensive survey of its legislative history and policies, and we determined that it required de novo trials. Hackley v. Roudebush, 520 F.2d 108 (D.C.Cir.1975). There is no warrant to construe Section 505, which incorporates Section 717, any differently. Second, the well developed law of burdens of proof and remedies under Title VII must henceforth apply to claims under Section 501 as well.
 
 
 25
 Third-and most important as far as the instant appeal is concerned-Section 505 contemplates that courts will stand on equal footing with administrative authorities in defining and fashioning affirmative action plans.[31] Any other interpretation would strain the plain meaning of the final sentence of Section 505(a)(1), which clearly contemplates that a court has discretion to grant a wide variety of relief under Section 501, including an "affirmative action remedy." A co-equal role for courts is also consistent with the allocation of authority to identify discrimination and fashion remedies for race and sex discrimination in federal employment under Title VII.[32] Furthermore, independent judicial definition of the terms of Section 501 is consistent with common sense and good policy. The courts have considerable expertise in identifying discrimination-because of their responsibility to enforce Title VII in the private sector as well as the public sector, they confront a vast number of claims presenting different fact situations. The courts have been able to devote more time and attention to individual cases than have the Office of Personnel Management or the Equal Employment Opportunity Commission, and, more importantly, compulsory process and discovery are available to federal litigants to help develop a factual record on the question of discrimination. The judiciary's independence, moreover, makes its efforts appear, to those claiming discrimination, more impartial and disinterested than the efforts of the civil service to police itself.
 
 
 26
 The legislative history of Section 505 attests to the strength of these concerns in the minds of the legislators who drafted it. Senator Cranston, the author of Section 505(a)(1), explained:
 
 
 27
 Mr. President, as one of the principal authors of section 501, I can say with some authority that it was enacted, in large part, as a result of the belief, on the part of Congress, that it was the responsibility of the Federal Government to be an "equal opportunity employer." The legislative history of the section 501 illustrates that with respect to the employment of handicapped individuals, Congress expected the Federal Government should be a leader.
 
 
 28
 Mr. President, to date, the record of the Federal Government in the employment of handicapped individuals has been disappointing. Testimony before the Subcommittee on the Handicapped revealed that in the first 2 years after enactment of section 501 only 12 Federal agencies have increased their rate of hiring disabled employees by more than 3 percent.
 
 
 29
 Mr. President, my amendment making available the remedies, rights, and procedures of title VII of the Civil Rights Act of 1964 should aid the Federal Government tremendously in attaining the goal of being "an equal opportunity employer" and in fulfilling its leadership responsibilities in this area.
 
 
 30
 124 Cong.Rec. 30347 (1978).[33] Senator Cranston also expressed his misgivings that the Equal Employment Opportunity Commission, which was about to get administrative jurisdiction over Section 501, had "no present expertise" in handling handicap discrimination claims. Id. Further indication of the role that Congress intended for the federal courts is furnished by its inclusion in the 1978 Amendments of an attorney fee provision for parties enforcing Section 501. See Section 505(b), 29 U.S.C. § 794a(b) (Supp. III 1979). Both the Senate and the House versions of the 1978 Amendments included such a provision, and both Houses emphasized the need to promote court enforcement of Section 501's affirmative action mandate.[34] By expressly providing for a private right of action and attorney fees, and by stressing the similarities between the handicapped and minority groups protected by Title VII, Congress showed that it expected courts to assume as active a role in eliminating unlawful discrimination against the handicapped as against other groups.
 
 
 31
 Therefore, for those claims of employment discrimination on the basis of handicap to which the 1978 Amendments apply, the federal courts should make an independent appraisal as to whether a federal employer acted unlawfully because the terms of its affirmative action program do not meet the standard of Section 501.
 
 III. Application of Section 501
 
 32
 We come, then, to the crux of this case: Did NASA's employment practices, as applied to Mr. Shirey, "provide adequate hiring, placement, and advancement opportunities for handicapped individuals" consistent with Section 501's requirement that it have an "affirmative action program plan"? To resolve this question we need not consider whether all the substantive standards of Title VII, as well as its procedural elements, apply to federal employment of the handicapped, either before or after the effective date of the 1978 Amendments. We need not consider whether the modification of subsection (u) in 1979, see notes 15, 22 supra, satisfies Section 501, or whether Section 501 required that modification. We need only decide the narrow question whether Section 501 permitted NASA to permanently deny Mr. Shirey the job benefits afforded his co-workers solely because he had been hired under excepted service authority, four and a half years earlier, on account of the severity of his physical disability.
 
 
 33
 We have never construed Section 501 before, and our task would be much harder if this were a more difficult case. Mr. Shirey, however, asks us to define, not the far fringes of the phrase "affirmative action," but its core: fair treatment of a critically disadvantaged group. Furthermore, the program before us places a burden precisely on those most in need of equal treatment, and for whose benefit Section 501 was enacted: qualified but severely handicapped workers. There is no problem with showing intent, since the different treatment of handicapped employees went on for so long, was codified in numerous regulations, and was actively promoted by the Civil Service Commission. Finally, the protestations of weighty governmental concerns advanced to justify this discrimination have been weakened considerably by the government's own change of heart.
 
 
 34
 Categorical, permanent denial of equal status is fundamentally inconsistent with the plain meaning and the purpose of Section 501. Although they are hardly terms of art, whatever "affirmative action" and "adequate opportunities" mean in the context of the Rehabilitation Act as a whole they mean at least that agencies may not discriminate on the basis of an employee's physical or mental disabilities without justification. The legislative history of Section 501 could not be more emphatic in identifying nondiscrimination as a crucial element in Section 501's affirmative action requirement:
 
 
 35
 The Committee emphasizes that the Federal Government must be an equal opportunity employer, and that this equal opportunity must apply fully to handicapped individuals. The Committee, therefore, expects the (Civil Service Commission) to ensure that there is no discrimination in employment for handicapped individuals within the Federal Government * * *.
 
 
 36
 S.Rep.No.93-318, 93d Cong., 1st Sess. 49 (1973), U.S.Code Cong. & Admin.News 1973, p. 2076. This same passage was cited in the legislative history of the 1978 Amendments, with Congress expressing dissatisfaction with the progress of affirmative action under Section 501 and providing for judicial involvement in the effort to combat discrimination. See note 33 supra.
 
 
 37
 Authoritative interpretations of Sections 503 and 504 of the Rehabilitation Act also equate "affirmative action" with nondiscrimination. Like Section 501, Section 503 also contains an affirmative action requirement:
 
 
 38
 Any contract in excess of $2,500 entered into by any Federal department or agency for the procurement of personal property and nonpersonal services (including construction) for the United States shall contain a provision requiring that, in employing persons to carry out such contract(,) the party contracting with the United States shall take affirmative action to employ and advance in employment qualified handicapped individuals as defined in section 706(7) of this title. * * *
 
 
 39
 29 U.S.C. § 793(a) (Supp. III 1979) (as amended). Also like Section 501, it does not expressly prohibit discrimination, but the Office of Federal Contract Compliance has consistently read Section 503 as forbidding discrimination.[35] That view is fully consistent with the approach courts have taken to the affirmative action programs upon which Section 503 was modeled. In a case involving the government's imposition of contract clauses requiring affirmative action in employment of racial minorities by federal construction contractors, the court stated, "The obligation to take affirmative action imports more than the negative obligation not to discriminate." Southern Illinois Builders Ass'n v. Ogilvie, 471 F.2d 680, 684 (7th Cir. 1972). The Supreme Court apparently has the same understanding of what affirmative action means. In construing Section 504 of the Rehabilitation Act it stressed that that section did not require affirmative action and implied that "affirmative action" would demand steps beyond mere "evenhanded treatment." Southeastern Community College v. Davis, 442 U.S. 397, 410-411, 99 S.Ct. 2361, 2369-70, 60 L.Ed.2d 980 (1979). More than nondiscrimination cannot mean less than it as well. See also American Public Transit Ass'n v. Lewis, 655 F.2d 1272, 1277 (D.C.Cir.1981).[36]
 
 
 40
 Furthermore, the rationale for any civil-rights type affirmative action program is that simply preserving the status quo of past practices, even if they are not consciously discriminatory, can serve to perpetuate the effects of past discrimination, so that the effects cannot be eliminated without changing the practices. See Franks v. Bowman Transportation Co., 424 U.S. 747, 767-768, 96 S.Ct. 1251, 1265-66, 47 L.Ed.2d 444 (1976); NAACP v. Allen, 493 F.2d 614, 618 (5th Cir. 1974); Associated General Contractors of Massachusetts v. Altshuler, 490 F.2d 9, 16 (1st Cir. 1973), cert. denied, 416 U.S. 957, 94 S.Ct. 1971, 40 L.Ed.2d 307 (1974). It would pervert the meaning of the phrase to give it an interpretation condoning the institutionalization of easily identifiable discrimination against the class protected by the affirmative action requirement.
 
 
 41
 This case provides more than ample illustration of the relationship between past discrimination and continuing employment practices. The excepted service appointment authority of subsection (u) is used only for those individuals who are qualified to fill a certain civil service position but whose disabilities would prevent accurate assessment of their skills by normal competitive appointment processes.[37] Like almost half of all the subsection (u) appointees before 1976,[38] Mr. Shirey is deaf. Since the Civil Service Commission approved the excepted service appointments of some 1,600 deaf people-including Mr. Shirey-we may assume that it believed deafness was the sort of handicap which might prevent a qualified person from obtaining an appointment through the competitive process. We note further that the chairman of the Commission, in 1976 testimony before a Senate subcommittee, admitted that in the past the standard competitive examinations had discriminated against the deaf.[39]
 
 
 42
 Thus, Mr. Shirey's excepted service appointment was not an indication that he was less qualified for the job than competitive, nonhandicapped applicants. Nor was it a "voluntary" choice, as the District Court seems to have thought,[40] except to the extent that the desire to be treated fairly is also voluntary. Mr. Shirey's special appointment meant only that both NASA and the Civil Service Commission agreed that it would have been discriminatory to make him submit to an appointment process favoring those with hearing ability in the normal range.
 
 
 43
 Four years after his appointment, however, Mr. Shirey had passed his probation and demonstrated his aptitude in two positions, with tasks of increasing responsibility and skill. Yet he did not stand on equal footing with his co-workers.[41] That difference had nothing to do with his hearing ability or the need to avoid discrimination. He was being treated less well than his fellow employees only because he was in a class initially determined by the severity of his handicap.
 
 
 44
 The government argues (and the District Court accepted the argument) that granting full job benefits to excepted service employees would undermine the incentive structure of the merit system. That argument plainly mistakes the nature of Mr. Shirey's challenge. The unlawful discrimination in this case occurred when Mr. Shirey was kept in the excepted service long after the reason for keeping him in a separate employment category had expired. He was working alongside and performing the same tasks as competitive service employees, and no expensive modification of his employment conditions was required.[42] His need for the benefits of competitive service status was certainly no less than that of his co-workers. And the President's subsequent modification of subsection (u), to provide a means for handicapped employees to convert to competitive service status after two years on the job, demonstrates that affording full benefits to proved handicapped employees will not destroy the merit system.[43]
 
 
 45
 The government also argues that its system of excepted service appointments for those with severe physical disabilities does not discriminate on the basis of disability because most handicapped individuals obtain jobs through the competitive process.[44] "The handicapped," however, are not a homogeneous group, and all that those who come within the rubric "handicapped" share is some trait outside the normal range of capabilities for that trait.[45] It need not be the same trait, or the same degree of difference-the blind and the deaf have little in common except that both are "handicapped." Therefore, it is senseless to suggest that discrimination against one group of handicapped individuals is justified because another group, with different abilities altogether or in different contexts, does not suffer discrimination.
 
 
 46
 The Civil Service Commission understood that fact in 1964, when it recognized that some, but not all, of the handicapped have disabilities so severe as to make it unlikely that they would qualify for jobs under the existing competitive appointment system. But the intelligence of that innovation does not excuse singling out the same group of people for purposes-provision of employment benefits-that have nothing to do with their particular disabilities. It may be that some individuals have handicaps that would make it impossible for them to do any job other than the one to which they were first appointed, and for these denial of some job protections might be warranted even under Section 501. But Section 501 does not allow discrimination on the basis of the severity of an individual's handicap when unrelated to the individual's qualifications or any other substantial governmental justification.[46]
 
 
 47
 We emphasize the narrow effect of this decision. The legal position of disabled employees like Mr. Shirey has changed significantly since January 1978. Leaving to one side the question of what substantive standards are implied in Section 505, the Equal Employment Opportunity Commission's regulations on handicap discrimination in government employment, which became effective in April 1978, provide protections for excepted service employees unavailable to Mr. Shirey. In March 1979 Executive Order 12125 gave handicapped excepted service employees relief basically identical to that Mr. Shirey seeks before this court. Finally, Mr. Shirey was the only handicapped excepted service employee at Goddard to lose his job in the January 1978 reduction-in-force.[47] In sum, Mr. Shirey's case seems to have arisen in the course of discovering unanticipated flaws in an otherwise praiseworthy government program for employing severely handicapped individuals, and we are confident that the system now in place will produce no more instances of discrimination as egregious as this one.
 
 IV. Issues Remaining
 
 48
 Although we have held that NASA's employment scheme as applied to Mr. Shirey violated Section 501 of the Rehabilitation Act of 1973, several important issues remain in this case.
 
 
 49
 The government has introduced affidavits to show that even if Mr. Shirey had received full competitive status, dating back to when he was first appointed, he still would have been separated during the reduction-in-force. If that is true, then Mr. Shirey's claims for back pay and injunctive relief depend on proof that he would have obtained another job through competitive reemployment or reinstatement rights. Mr. Shirey has also claimed discrimination in promotional opportunities, but he has not proved that he would have received a second promotion in the absence of discrimination. All of these questions present factual issues requiring resolution by the District Court.
 
 
 50
 Therefore, we reverse the District Court's order granting summary judgment for defendants[48] on plaintiff's Rehabilitation Act claim, and we remand for determination by the District Court as to what further relief may be appropriate.
 
 
 51
 So ordered.
 
 TAMM, Circuit Judge, dissenting:
 
 52
 I regret that I am unable to join Judge Wright's scholarly and extremely well-researched opinion in this case. Given the limited precedential value of the decision rendered by the court today,[1] however, I will confine my remarks to brief and general observations on what I feel are the most significant errors in the analysis presented by the majority.
 
 
 53
 When one casts aside the indisputable observations made by the majority regarding the federal government's avowed role as an equal opportunity employer, one realizes that Judge Wright's opinion reaches an almost extraordinary result: the court holds, in effect, that aspects of a program designed to assist handicapped individuals in securing federal employment in fact violate an Act of Congress that mandates that agencies establish affirmative action programs. The achievement of this, shall I say, interesting conclusion was made possible by nothing less than a nimble judicial sleight-of-hand, and I would like briefly to set forth the basic elements of this achievement.
 
 
 54
 The majority opinion conveys, I believe, several erroneous impressions regarding both the federal hiring programs that obtained at the time Mr. Shirey was hired in 1973 and the options that he had available at that time in pursuit of federal employment. In 1973-as in 1981-positions under the federal civil service fell for application purposes under one of two broad categories, "competitive service" and "excepted service." Most employees in federal service, including most handicapped employees, held in 1973 and hold today positions in the competitive service. Employees who occupy such positions have generally been hired, as might be expected, through a competitive selection process. See 5 U.S.C. § 3304 (1976 & Supp. III 1979). By contrast, excepted service employees have not gained their positions through any formal competitive process open to all comers; rather, either because special considerations regarding the position render competitive scrutiny inapplicable, or because certain characteristics of individual applicants are thought as a matter of policy to merit exempting them from the competitive process, a number of positions and individuals have been placed outside the formal competitive regime.[2]
 
 
 55
 As the majority notes,[3] individuals suffering from severe physical or mental disabilities were and are among those who could be offered federal positions for which they were qualified without participation in the competitive process.[4] Mr. Shirey was, in light of his deafness, hired for a position in NASA as a Computer Systems Analyst as an excepted service employee. It is clear that Mr. Shirey met the requirements of the position at the time he was hired,[5] and that fact is evinced by his competent performance for over four years in that job. It is also manifest, however, that Mr. Shirey could have sought appointment to his NASA position through the competitive service process; indeed, his own amended complaint in this case expressly acknowledges that "handicapped persons are also hired through the regular 'competitive service' procedures...."[6] Mr. Shirey was, it should be emphasized, quite correct in this regard. The district court found that "the excepted service program serves as a supplement to NASA's hiring programs. Defendant NASA employs over 24,000 people and over 1,500 of those are handicapped competitive service personnel." Shirey v. Campbell, No. 78-2177 (D.D.C. August 29, 1980), Memorandum Opinion at 3; Appellants' Appendix (A.A.) at 8a (emphasis added).
 
 
 56
 In sum, in spite of the message implied in the majority's statement that the excepted service appointment authority for the handicapped is "used only for those individuals who are qualified ... but whose disabilities would prevent accurate assessment of their skills by normal competitive appointment processes,"[7] it is clear that many deaf applicants have successfully run the gauntlet of those processes. Mr. Shirey could have chosen to run that gauntlet as well,[8] just as he could earlier have attempted to convert to the competitive service.[9] I certainly do not mean to criticize Mr. Shirey for the route he took toward federal employment; I do, however, take issue with the majority's statement that Mr. Shirey's decision to proceed by the excepted service path as opposed to the competitive one was anything other than voluntary.[10]
 
 
 57
 With this background, it is possible to discern the questions that this case does pose, and, equally importantly, to recognize those issues that are not before the court. It is clear to me that this case does not involve discrimination against handicapped employees because they are handicapped; rather, it concerns "discrimination" against all federal employees who entered the federal service through the noncompetitive, excepted procedure. Precisely as the majority opinion notes, "Mr. Shirey had completely different-and inferior-job protection rights, because he had been 'excepted' from the competitive appointment process."[11] As the majority thus concedes, Mr. Shirey was not required to "compete" with other qualified applicants for the position he received; rather, he was the direct beneficiary of a program designed to assist handicapped individuals in the pursuit of federal jobs. This very program, as the majority notes, permitted Mr. Shirey to "bypass the competitive appointment system."[12]
 
 
 58
 When the facts are examined in this context, the incongruity of this litigation is apparent. Mr. Shirey was awarded his position under a program that, by any measure, was the product of enlightened discrimination in his favor. To be sure, Mr. Shirey was qualified for the position he received, but so too were many who sought the same job or similar ones through the competitive examination processes and yet who were not hired because they failed to earn the highest grades in the competition. Any number of these individuals were more qualified in every respect than Mr. Shirey, yet he received the position; had Mr. Shirey been fairly tested by competitive means, it is not at all clear that he would have been hired by NASA. Where the excepted service provision relevant in this case operates, let us remember, a position need not be awarded to the individual most qualified, as in the competitive service system-it need only be awarded to someone physically handicapped and "likely to succeed in the performance of the duties." 5 C.F.R. § 213.3102(u) (1981); see note 5, supra. The district judge whose decision the court today reverses noted that the excepted service process thus "offers an acceptable supplement to the job opportunities currently available to handicapped persons through the competitive service."[13]
 
 
 59
 I thus find myself in complete agreement with the position taken by the district court and urged by the government appellees in this case. Mr. Shirey was indeed a member of a class that possessed inferior job security rights; the cause of the discrimination of which he complains, however, was not the fact of his handicapped status but rather was his status as an excepted service employee. When faced with a reduction in force, federal administrators face a task of great difficulty in determining which employees to retain and which employees to release. Some employees must go. In the case at the bar, the Civil Service Commission determined that employees who entered federal service through the competitive process should be awarded superior job retention rights than those accorded excepted service employees. There is absolutely no doubt that this distinction, however one may disagree with it as a matter of policy, is a rational and reasonable one. As the appellees in this case note, it is entirely reasonable for federal agencies to encourage participation in the competitive appointment process by according greater benefits to competitive service employees. See Brief for Appellees at 19-21. The morale and resentment problems that might be posed by the perception among competitive service employees that excepted employees are treated indistinguishably from "regular" ones also provide valid bases for the discrimination of which Mr. Shirey complains.
 
 
 60
 Yet this case is not, of course, an equal protection challenge, and hence, considerations of rationality are not strictly relevant. What is most interesting-and most disturbing-to me about the majority's decision today is clear when we consider the issue this case does pose. The question raised in this litigation involves the scope of an Act of Congress mandating affirmative action. The court today employs a statute that requires that federal agencies establish affirmative action plans to rule that the treatment of Mr. Shirey-and by implication his "class"-violates federal law. Section 501 of the Rehabilitation Act of 1973 requires that agencies develop affirmative action strategies for the hiring, placement, and advancement of handicapped individuals. I agree with Judge Wright that this mandate implicitly proscribes employment discrimination against handicapped persons. Majority opinion at 1200-1201. Yet, as I have argued above and as the district court held, we do not before us have a case in which an individual has been discriminated against because he is handicapped. There is simply no link demonstrated by either Mr. Shirey or by the majority between Mr. Shirey's deafness and his inferior job retention rights; he had those inferior rights because he was an excepted service employee, not because he was deaf.
 
 
 61
 At the heart of this dissent, then, is the belief that this court, in the guise of defining the "substantive scope" of section 501,[14] dons a legislative mantle to modify a program it apparently feels does not go far enough in affirmatively ameliorating the disadvantages of deafness. I simply do not believe that section 501 requires, however, that federal agencies guarantee the full benefits of competitive service status to those handicapped individuals who enter federal employment through the excepted service program. It is manifest that section 501 provides agencies with considerable discretion in formulating an affirmative action strategy. The district judge observed that that provision does not require that all such affirmative action plans "fall within the competitive service,"[15] and I agree completely with that conclusion.
 
 
 62
 That the federal government in 1979 changed its policy and currently permits handicapped excepted service employees to convert to competitive status is irrelevant in the current context, save that it renders today's decision a narrow one. Yet if we forget for the purposes of this litigation that change of policy-and again, it is absolutely irrelevant to the resolution of the issues of statutory construction posed by this case-we can discern the full impact of the court's reasoning. Put most simply, the majority's application of section 501 has the effect of mandating that all handicapped excepted service employees be at some point accorded the benefits of competitive service status. Nothing in the language of that section or in the legislative history grounds this intrusion upon the discretion Congress has accorded agency administrators; indeed, the court's conclusion today is at the very most a teleological product of the Rehabilitation Act.
 
 
 63
 As the court rightly notes, the core of affirmative action is fair treatment, and I harbor absolutely no doubt that the government program Mr. Shirey challenges in this litigation treated him fairly. I suggested above that Mr. Shirey could have sought his position through the competitive processes and, save for the glib and simple conclusion in the majority opinion that his acceptance of an excepted service appointment was not a voluntary choice,[16] there is no evidence indicating the contrary. If, however, Mr. Shirey believes that the competitive examination scheme was or is unfair to deaf applicants, then let him challenge forthrightly that scheme. As I view the matter, such a challenge would be far more consonant with the judicial role than is asking a court to gauge whether an affirmative action program goes sufficiently far in correcting the disadvantages of a physical handicap.
 
 
 64
 As a matter of policy, the court's decision today may well be a correct one. Once a handicapped person has secured a government job through the excepted service, at some point after he has performed acceptably in the post he should be given the same perquisites and entitlements that a competitive service employee receives. The federal government has now reached this conclusion, and I commend the concerned officials for their decision. That a decision is correct in a policy sense, however, does not mean that it is the proper one for a court to reach. Federal courts simply do not exist to right the wrongs of Congress and agencies as ad hoc purveyors of justice, however better the nation would be served were that the case. This is the case even when the challenge at issue is garbed in the attractive sartorial splendor of "affirmative action."
 
 
 65
 I would affirm the decision of the district court, and I therefore dissent.
 
 
 
 [1]
 Two of our recent decisions involved the rights of handicapped federal employees, but we did not reach the questions of substantive employment rights addressed here since neither appellant raised the statutory issue considered below. See Ryan v. Federal Deposit Insurance Corp., 565 F.2d 762 (D.C.Cir.1977) (per curiam ); Doe v. Hampton, 566 F.2d 265 (D.C.Cir.1977). In Ryan we remanded to the agency, in effect, for consideration of its obligations toward its handicapped employees. 565 F.2d at 764. Cf. Fowler v. United States, 633 F.2d 1258 (8th Cir. 1980) (employee granted relief on constitutional grounds without considering statutory claim); Shaposka v. United States, 563 F.2d 1013, 1018 (Ct.Cl.1977) (employee granted relief on procedural grounds)
 
 
 [2]
 See 5 C.F.R. § 213.3102(u) (1981); text accompanying notes 8-16 infra
 
 
 [3]
 See Appendices to appellant's brief (hereinafter "App.") at 41a-44a
 
 
 [4]
 See 5 C.F.R. §§ 351.201-351.705 (1981) (retention standing in a reduction-in-force); id. §§ 330.201-330.306 (reemployment and displaced employee priorities in a reduction-in-force). There are two levels of regulation governing such job actions. The Civil Service Commission (now the Office of Personnel Management) has promulgated basic, government-wide rules. These (1) require that federal employers establish job retention registers according to groups and subgroups based on job status and eligibility for specific preferences, such as the veteran's preference, and within subgroups according to length of tenure, and (2) require that employees with the lowest retention standing be released first when jobs are eliminated at any particular level, that employees be allowed to displace others in lower retention subgroups from jobs for which the former are qualified, and that employees with high retention standing be put first in line for rehiring. See generally Federal Personnel Manual ch. 351. Individual agencies can establish regulations for allocating displacement rights among employees in the same retention subgroups and for breaking ties between employees with the same length of time in service. So, for instance, employees in retention subgroup II-A who are separated from their jobs must be allowed to displace employees in subgroup II-B holding jobs for which the II-A employees are qualified, within the same area of the agency. 5 C.F.R. § 351.703 (1981). But an agency decides on its own whether employees within the same retention subgroup may displace each other, based on factors such as length of time in service
 
 
 [5]
 There are several crucial differences between the reduction-in-force rights of employees appointed through competitive processes, see note 4 supra, and those like Mr. Shirey not appointed through competitive processes. First, only the competitive employees are guaranteed the right to displace other employees in lower retention subgroups. 5 C.F.R. § 351.703(a) (1981). Second, employees whose positions are "excepted" from the competitive appointment system can only be reassigned to other jobs excepted for the same reason. Id. § 351.403(b)(2); see notes 8-15 infra and accompanying text. Therefore, Mr. Shirey could only have replaced another severely handicapped employee (with lower job retention status) working at Goddard at a job for which Mr. Shirey was qualified, and then only if NASA had established its own displacement scheme for noncompetitive employees. Excepted service employees are also prevented from applying for and being considered for promotion to vacant competitive service positions. See Federal Personnel Manual 306-C-12
 It is important to note that an Executive Order in 1979 guaranteed future employees in Mr. Shirey's position a means to acquire competitive service status after two years on the job. See notes 15, 22 infra.
 
 
 [6]
 In the letter informing him that he would be separated on January 20, 1978, Mr. Shirey was told that he could appeal to the Civil Service Commission's Federal Employee Appeals Authority no later than 15 days after his job ended. Letter from H. Fivehouse to E. Shirey, November 29, 1977. Mr. Shirey filed his appeal on January 30, 1978, and it was denied on September 6, 1978. FEAA Decision No. DCQ35180197. At the time he appealed to the FEAA, Mr. Shirey had no other means of challenging the action taken against him through the administrative process, although new regulations that became effective in April 1978 would have provided another forum for review of his handicap discrimination claims. See note 18 infra. Mr. Shirey had already pursued one administrative appeal, and the new regulations would have permitted, but did not require, him to commence a second appeal. See 29 C.F.R. § 1613.708(c) (1981). But see Counts v. United States Postal Service, 631 F.2d 46 (5th Cir. 1980) (per curiam ) (remanding case begun in 1974 for consideration by Equal Employment Opportunity Commission under new regulations)
 
 
 [7]
 Appellee suggests that we should not consider Mr. Shirey's argument on the meaning of the Rehabilitation Act, because it was not identified in his statement of the issues presented for review in his opening brief on appeal. See Fed.R.App.P. 28(a)(2). The issue was, however, discussed in both appellant's brief, see appellant's brief at 28 n.*, and in his reply brief, see appellant's reply brief at 15-17. Furthermore, it was extensively discussed at oral argument, and we have sought and received supplemental briefs from both parties on the issue. Although we shall seldom consider arguments not clearly presented in the statement of issues, Fed.R.App.P. 28(a) is not inflexible. Consistent with precautions to ensure fairness to the parties and adequate airing of the issues, Courts of Appeals have discretion to consider such arguments. See, e.g., Brown v. Avemco Investment Corp., 603 F.2d 1367 (9th Cir. 1979); Harris v. Smith, 372 F.2d 806, 815 (8th Cir. 1967); cf. Consumers Union v. FPC, 510 F.2d 656, 661-662 (D.C.Cir.1974) (on petition for rehearing). In this case we have deemed it wise to consider a pertinent statutory claim before reaching the merits of the substantial constitutional claim also briefed and argued by the parties
 We do not reach appellant's constitutional claims, based on Fowler v. United States, supra note 1, 633 F.2d 1258, since we dispose of this case on statutory grounds. We note, however, that incorporation of § 717 of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-16 (1976), into the Rehabilitation Act provides a strong argument that statutory remedies are exclusive in this field. See Brown v. General Services Administration, 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976).
 
 
 [8]
 The relevant differences between competitive service and excepted service positions are identified at notes 4-5 supra
 
 
 [9]
 See, e.g., 15 U.S.C. § 1504 (1976) (Assistant Secretary of Commerce); 28 U.S.C. § 536 (1976) (Federal Bureau of Investigation)
 
 
 [10]
 5 U.S.C. § 2102(a)(1)(B) (1976)
 
 
 [11]
 See generally 5 C.F.R. §§ 213.101-213.3295 (1981). As of June 1974 there were approximately 135,400 persons employed by the federal government in excepted service positions created by Civil Service Commission regulation. Note, The Coverage of Federal Excepted Service Personnel Under the Equal Employment Opportunity Act of 1972, 65 Geo.L.J. 837, 840 n.13 (1977)
 
 
 [12]
 See, e.g., 5 C.F.R. § 213.3102(d) (1981) (attorneys); id. § 213.3105(b) (6) (Treasury Department criminal investigators "for special assignments"); id. § 213.3102(z) (White House Fellows)
 
 
 [13]
 See, e.g., id. § 213.3102(g) (part-time work); id. § 213.3102(n) (local physician employed on fee basis); id. § 213.3102(y) (summer employment for finalists in national science contests)
 
 
 [14]
 But cf. id. § 213.3102(bb) (positions to be filled by aliens in the absence of qualified citizens)
 
 
 [15]
 When Mr. Shirey was first hired, subsection (u) provided:
 Positions when filled by severely physically handicapped persons who: (1) Under a temporary appointment have demonstrated their ability to perform the duties satisfactorily; or (2) have been certified by counselors of State vocational rehabilitation agencies or the Veterans Administration as likely to succeed in the performance of the duties.
 In 1979 a final sentence was added to both subsections (t) and (u):
 Upon completion of 2 years of satisfactory service under this authority, the employee may qualify for conversion to competitive status under the provisions of Executive Order 12125 and implementing regulations issued by the Office.
 See note 22 infra.
 
 
 [16]
 From 1964 to 1967 only 148 severely handicapped persons began federal employment under subsection (u) authority. In 1968, 145 more received excepted service appointments, and in 1969 the number was 240. From 1969 through 1973, before the Rehabilitation Act went into effect, 1,939 more severely handicapped persons received subsection (u) appointments. U.S. Civil Service Commission, A Chain of Cooperation: Severely Physically Handicapped Employees in the Federal Service 2 (1976) (Bureau of Recruiting and Examining Pub. No. 43) (hereinafter cited as A Chain of Cooperation). One of these, of course, was Mr. Shirey
 This increase is possibly more dramatic than the numbers indicate. Through 1971 the Post Office was responsible for 45% of the subsection (u) appointments, but after the Postal Service became a quasi-independent corporation its hiring was no longer included in the government totals. Id. at 3, 4 n.*. Thus, although yearly hiring totals remained more or less constant throughout the 1970-1973 period, the government in fact almost doubled the number of handicapped persons hired in the last two years.
 
 
 [17]
 Act of June 10, 1948, Pub.L.No.80-617, ch. 434, 62 Stat. 351. In relevant part, the 1948 Act provides:
 (N)o person shall be discriminated against in any case because of any physical handicap, in examination, appointment, reappointment, reinstatement, reemployment, promotion, transfer, retransfer, demotion, or removal, with respect to any position the duties of which, in the opinion of the Civil Service Commission, may be efficiently performed by a person with such a physical handicap: And provided further, That such employment will not be hazardous to the appointee or endanger the health or safety of his fellow employees or others.
 (Emphasis in original.) Under authority of this provision, the Civil Service Commission originally promulgated regulations simply banning discrimination on account of physical handicap in all appointments, removals, or suspensions. 20 Fed.Reg. 9879 (1955).
 
 
 [18]
 The current version of this statute simply grants the President power to promulgate rules prohibiting "discrimination because of handicapping condition * * *." 5 U.S.C. § 7203 (Supp. III 1979). At the time Mr. Shirey lost his job the only regulation promulgated under authority of the 1948 Act and its successors was found at 5 C.F.R. § 713.401. It covered only appointments to positions in the competitive service and thus did not apply to Mr. Shirey's case. As part of a 1978 reorganization, authority to make rules under the Act was shifted to the Equal Employment Opportunity Commission, which promulgated a broad scheme of complaint procedures to enforce equal opportunity for the handicapped. See 43 Fed.Reg. 12295 (1978) (current version at 29 C.F.R. §§ 1613.701-1613.710 (1981)). This system applies to both competitive and excepted positions. See 29 C.F.R. § 1613.702(f) (1981). It did not go into effect, however, until after Mr. Shirey had taken his appeal to the Federal Employee Appeals Authority, so Mr. Shirey never received the benefit of its broad antidiscrimination standard, see id. § 1613.703
 
 
 [19]
 In pertinent part § 501 provides:
 (b) Federal agencies; affirmative action program plans
 Each department, agency, and instrumentality (including the United States Postal Service and the Postal Rate Commission) in the executive branch shall, within one hundred and eighty days after September 26, 1973, submit to the Civil Service Commission and to the Committee an affirmative action program plan for the hiring, placement, and advancement of handicapped individuals in such department, agency, or instrumentality. Such plan shall include a description of the extent to which and methods whereby the special needs of handicapped employees are being met. Such plan shall be updated annually, and shall be reviewed annually and approved by the Commission, if the Commission determines, after consultation with the Committee, that such plan provides sufficient assurances, procedures and commitments to provide adequate hiring, placement, and advancement opportunities for handicapped individuals.
 Other subsections of § 501(1) establish an interagency committee on handicapped employment to assist the Civil Service Commission and make recommendations to state governmental agencies for facilitating employment of the handicapped, (2) require the Civil Service Commission to report to Congress yearly on the state of its efforts to employ the handicapped, and (3) exempt unpaid individuals working for the federal government under individual rehabilitation programs.
 
 
 [20]
 See generally Letter from R. Hampton, Chairman, U.S. Civil Service Commission, to Hon. J. Randolph, Chairman, Subcommittee on the Handicapped (Feb. 20, 1976), reprinted in Rehabilitation of the Handicapped Programs, 1976 Hearings Before the Subcommittee on the Handicapped of the Senate Committee on Labor and Public Welfare, 94th Cong., 2d Sess. 825 (hereinafter cited as 1976 Hearings )
 In 1974 and 1975, 1,285 persons were hired under subsection (u) authority, an increase of approximately 75% over the previous two years. A Chain of Cooperation, supra note 16, at 2. But see note 33 infra and accompanying text, reporting congressional complaints that only 12 federal agencies increased their hiring rate for handicapped employees more than 3% after the Rehabilitation Act was passed. It is possible that the Civil Service Commission's emphasis on excepted service appointments led agencies to place handicapped people in excepted service positions rather than hiring them through more cumbersome competitive processes. Cf. 1976 Hearings, supra, at 831-832 (increased excepted service hiring evidence that handicapped employment has not suffered during federal hiring freeze). As of 1975 the Civil Service Commission did not know how many handicapped employees were in the competitive service. Id. at 840. See also note 44 infra.
 
 
 [21]
 This section originated in the Senate Committee on Human Resources, which stated in its report:
 The committee believes now as it did in 1973 that the Federal Government must be "an equal opportunity employer." (Section 505) will aid in attaining that goal by providing for individuals aggrieved on the basis of their handicap the same rights, procedures, and remedies provided individuals aggrieved on the basis of race, creed, color, or national origin.
 In addition, application of title VII will make available "back pay" as a remedy for a handicapped individual when he or she is the prevailing party. * * * Further, application of the title VII provisions makes specific the right to bring a private right of action with respect to section 501 * * *.
 * * * The committee believes that the rights extended to handicapped individuals under title V(,) that is, Federal Government employment, * * * are, and will remain, in need of constant vigilance by handicapped individuals to assure compliance, and the availability of attorney's fees should assist in vindicating private rights of action * * * arising under section(s) 501 and 504.
 S.Rep.No.95-890, 95th Cong., 2d Sess. 18-19 (1978).
 
 
 [22]
 Two changes made within a few months of the 1978 Amendments nevertheless have some bearing on this case. Shortly before passage of the 1978 Amendments the Equal Employment Opportunity Commission promulgated regulations setting forth administrative grievance procedures for all handicapped federal employees, whether or not in the competitive service. See note 18 supra. And in 1979 President Carter ordered civil service regulations changed to allow handicapped employees hired under subsection (t) or (u) authority to convert to competitive service status after two years of satisfactory excepted service. Executive Order No. 12125, 44 Fed.Reg. 16879 (1979) (codified at 5 C.F.R. § 213.3102(t)-(u) (1981)); see note 15 supra
 
 
 [23]
 See, e.g., note 39 infra and accompanying text
 
 
 [24]
 The legislative history of the 1948 Act reflects this view:
 The committee is of the definite belief that any measure designed to eliminate or minimize discrimination arising solely from the physical condition of any applicant * * * is in line with American standards and that the example needs first to be set by the Government of all the people.
 There is no question that handicapped persons take their places of responsibility in time of national stress and discharge their responsibilities and obligations with great credit, many of them displaying rare skills and talents, which the Government finds extremely scarce during emergencies.
 S.Rep.No.1222, 80th Cong., 2d Sess. 1-2 (1948). The bill as passed, however, did not include a Senate amendment providing for noncompetitive transfers to competitive positions for handicapped Post Office employees, thus implying certain limits to Congress' zeal. Compare id. with H.R.Rep.No.2010, 80th Cong., 2d Sess. (1948) (conference report).
 
 
 [25]
 Cf. tenBroek & Matson, The Disabled and the Law of Welfare, 54 Calif.L.Rev. 809, 815-816 (1966) (evolution of welfare policy concerning the handicapped from segregation and "custodialism" to "integrationism")
 
 
 [26]
 See Office of Personnel Management, Handbook of Selective Placement of Persons with Physical and Mental Handicaps in Federal Civil Service Employment 31 (1979) (App., supra note 3, at 48a)
 
 
 [27]
 Note that nearly half of the people receiving subsection (u) appointments through 1975 were deaf. A Chain of Cooperation, supra note 16, at 14; see notes 37-39 infra and accompanying text
 
 
 [28]
 See App., supra note 3, at 52a-53a
 
 
 [29]
 Although a final administrative decision was rendered before the effective date of § 505, Mr. Shirey's case was still pending because the time for filing suit in the District Court had not expired. Section 505 applied to administrative proceedings in process on the date it became effective, see Grubbs v. Butz, 514 F.2d 1323, 1327 (D.C.Cir.1975) (§ 717 of Title VII), and to ongoing District Court proceedings, cf. Womack v. Lynn, 504 F.2d 267 (D.C.Cir.1974) (§ 717). Therefore, it should also apply to a case in which the plaintiff was not yet out of time to seek review in the District Court after freshly concluded administrative proceedings, as long as the suit was filed within 30 days of the effective date of the statute. Cf. Clark v. Goode, 499 F.2d 130, 133 (4th Cir. 1974) (Title VII) (alternative holding). Our recent decision in Brown v. Turner, 659 F.2d 1199 (D.C.Cir.1981), does not control this case. Brown dealt with a plaintiff who did not initiate administrative proceedings on a claim accruing before the effective date of § 717 until several years after the effective date of § 717. It therefore involved an archetypal "stale" claim that the time limits in § 717 were meant to bar. Id. at 1201; see Delaware State College v. Ricks, 449 U.S. 250, 259-260, 101 S.Ct. 498, 504-05, 66 L.Ed.2d 431 (1980). Mr. Shirey's claim, on the other hand, was far from stale; he was actively pursuing it at the time § 505 became effective. Had the administrative appeal taken less time to decide, we may assume that Mr. Shirey would have filed in the District Court before § 505 became effective, bringing his case squarely within the rule of Womack. We are reluctant to hold that there is a small group of claims, defined only by the vagaries of administrative decisionmaking schedules, to which § 505 does not apply, when it would clearly apply to identical claims that accrued and were initiated before, after, and simultaneously with the claims in question. The word "pending" is not so precise as to require such unfairness
 
 
 [30]
 Neither the District Court in this case nor any other court has questioned the availability of an independent private right of action to enforce § 501 after § 505 became effective. See, e.g., Counts v. United States Postal Service, supra note 6, 631 F.2d 46; Arthur v. Frederickson, 25 E.P.D. P 31,510 (D.D.C.1981); Hassell v. United States Postal Service, N.D.Ill.No.80-C-2566 (Oct. 10, 1980); Garrett v. Bolger, E.D.N.Y. No. 78-C-2001 (June 24, 1980). Thus we do not confront here the difficult operation required to determine whether a statute that is silent as to remedy or enforcement implies a private right of action to enforce it. See Transamerica Mortgage Advisors, Inc. v. Lewis, 444 U.S. 11, 21-24, 100 S.Ct. 242, 248-49, 58 L.Ed.2d 343 (1979); Cannon v. University of Chicago, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979); Rogers v. Frito-Lay, Inc., 611 F.2d 1074 (5th Cir. 1980) (no private right of action under § 503 of the Rehabilitation Act)
 
 
 [31]
 Insofar as the meaning of "affirmative action" is a question of law only, courts had the power to overrule agency definitions even before § 505 was passed. See Ryan v. Federal Deposit Insurance Corp., supra note 1, 565 F.2d at 763 (semble)
 
 
 [32]
 Under § 717(b), as amended, the Office of Personnel Management has authority to make a preliminary determination on the issue of discrimination, but the Equal Employment Opportunity Commission has final authority within the Executive Branch to determine whether discrimination has taken place and what should be the appropriate remedies. The EEOC also has authority to issue regulations and orders to ensure maintenance of affirmative programs of equal employment opportunity. See 42 U.S.C. § 2000e-16(b) (1976); Reorganization Plan No. 1 of 1978, § 3, 43 Fed.Reg. 19087 (1978), reprinted in 42 U.S.C. § 2000e-4 app. at 398 (Supp. III 1979), and in 92 Stat. 183 (1978). Charging parties, however, if aggrieved by the final disposition of their complaints of EEOC's failure to take action thereon may bring suit within 30 days (180 days if EEOC has taken no action) challenging employment practices unlawful under Title VII. 42 U.S.C. § 2000e-16(c) (1976). If the court finds that the federal employer has intentionally engaged in unlawful practices, it may order the same remedies that EEOC could have imposed by order or regulation. Id. §§ 2000e-16(d), 2000e-5(g). The administrative record and determinations have no undue weight in this process. Hackley v. Roudebush, 520 F.2d 108, 156 (D.C.Cir.1975); see H.R.Rep.No.899, 92d Cong., 2d Sess. 21-22 (1972) (conference report), U.S.Code Cong. & Admin.News 1972, p. 2137. But cf. Johnson v. Hampton, 452 F.Supp. 1, 5 (E.D.Va.1977), aff'd mem., 577 F.2d 734 (4th Cir. 1978)
 Since 1978 the allocation of administrative responsibility for enforcing the Rehabilitation Act in federal employment is nearly identical. The Office of Personnel Management has initial authority to approve affirmative action plans, but EEOC handles all complaints of handicap discrimination. See note 18 supra. The Merit Systems Protection Board may also hear such complaints, 5 U.S.C. § 7702(a)(1)(B)(iii) (Supp. III 1979), subject to District Court review, see id. § 7703(b)(2).
 
 
 [33]
 Cf. S.Rep.No.95-890, supra note 21, at 18-19:
 Section 118 of the committee bill amends title V of the Rehabilitation Act of 1973 by adding two new sections designed to enhance the ability of handicapped individuals to assure compliance with the civil rights provisions of title V and to facilitate the coordination among Federal departments and agencies with respect to the implementation and enforcement of title V and the regulations promulgated thereunder.
 Section 501 was intended to provide a focal point for the hiring, placement, and advancement of handicapped individuals in the Federal Government.
 The committee, in the report to accompany S. 1875 (S.Rept. 93-318)(,) found:
 Hearings in the 92nd Congress on vocational rehabilitation pointed out that despite the Civil Service Commission's experience and actions in this area, Federal employment policies with regard to handicapped individuals continued to be found wanting. The committee emphasizes that the Federal Government must be an equal opportunity employer, and that this equal opportunity must apply fully to handicapped individuals. The committee, therefore, expects the CSC to ensure that there is no discrimination in employment for handicapped individuals within the Federal Government, and to take all necessary steps to ensure that the special needs of handicapped individuals are met.
 In testimony before the Subcommittee on the Handicapped, Deborah Kaplan of the Disability Rights Center noted that she had been examining the implementation of section 501 and recommended that legislative changes be made to "make it stronger and easier to enforce and to provide the same civil rights protection to the disabled that other minorities have in employment with the Federal Government." Ms. Kaplan's group discovered that in the first 2 years after enactment of section 501 "only 12 Federal agencies have increased their rate of hiring disabled employees by more than 3 percent."
 The committee believes now as it did in 1973 that the Federal Government must be "an equal opportunity employer." The amendment to section 501 will aid in attaining that goal by providing for individuals aggrieved on the basis of their handicap the same rights, procedures, and remedies provided individuals aggrieved on the basis of race, creed, color, or national origin.
 Note that § 505 was not contested by any Senator, and the bill in which it was included passed the Senate 81-1. 124 Cong.Rec. 30585 (1978). The House version of the 1978 Amendments contained no such provision, but in conference § 505 was retained unchanged except for the addition of language directing the courts to take into account the costs of any remedies they ordered. See H.R.Rep.No.1780, 95th Cong., 2d Sess. 93 (1978) (conference report), U.S.Code Cong. & Admin.News 1978, p. 7312.
 
 
 [34]
 See S.Rep.No.95-890, supra note 21, at 19-20; H.R.Rep.No.95-1149, 95th Cong., 2d Sess. 21 (1978), U.S.Code Cong. & Admin.News 1978, p. 7332. The House report states, "(D)isabled individuals are one of the very few minority groups in this country who have not been authorized by the Congress to seek attorneys' fees. The amendment proposes to correct this omission and thereby assist handicapped individuals in securing the legal protection guaranteed them under Title V of the act." While the passages in these reports on attorney fees may not be dispositive evidence of Congress' intent with regard to § 501, cf. Rogers v. Frito-Lay, Inc., supra note 30, 611 F.2d at 1081-1082 (refusing to imply cause of action under § 503 on the basis of the passage quoted above), as one indication among many of the role Congress envisioned for the courts these passages are entitled to some attention from a careful interpreter
 
 
 [35]
 From the first regulations interpreting this section the government has placed the following clause in its procurement contracts:
 Affirmative Action for Handicapped Workers
 (a) The contractor will not discriminate against any employee or applicant for employment because of physical or mental handicap in regard to any position for which the employee or applicant for employment is qualified. The contractor agrees to take affirmative action to employ, advance in employment and otherwise treat qualified handicapped individuals without discrimination based upon their physical or mental handicap in all employment practices such as the following: Employment, upgrading, demotion or transfer, recruitment, advertising, layoff or termination, rates of pay or other forms of compensation, and selection for training, including apprenticeship.
 
 
 [39]
 Fed.Reg. 20567 (1974) (codified at 41 C.F.R. § 60-741.4 (1980)) (emphasis added)
 
 
 [36]
 Appellee suggests that Southeastern Community College v. Davis, 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979), precludes a determination that NASA's conduct in this case was discrimination, since in that case Southeastern Community College's unwillingness to make "major adjustments" in its nursing program did not constitute discrimination. 442 U.S. at 413, 99 S.Ct. at 2370. Any differences between the substantive standards of § 501 and § 504 aside, it is clear that the "adjustments" sought by the deaf plaintiff in Davis were of a completely different magnitude from the "adjustment" Mr. Shirey sought from NASA. In Davis the Court found it "undisputed that respondent could not participate in Southeastern's nursing program unless the standards were substantially lowered," and the Court held that "Section 504 imposes no requirement upon an educational institution to lower or to effect substantial modifications of standards to accommodate a handicapped person." Id. At the same time, however, the Court recognized that "situations may arise where a refusal to modify an existing program might become unreasonable and discriminatory." Id. at 412-413, 99 S.Ct. at 2370. This case presents just such a situation. In general, Davis dealt with the meaning of the phrase "otherwise qualified" in § 504, an issue completely absent from this case because the Civil Service Commission had already determined that Mr. Shirey was qualified to hold his job. There is no doubt that Mr. Shirey was fully able to do the work of competitive service computer systems analysts, and we do not hold that NASA had any obligation to lower its standards to accommodate Mr. Shirey. Furthermore, allowing Mr. Shirey some means to convert to competitive status would have cost NASA little, if anything-a stark contrast to the situation in Davis, where the plaintiff sought individual supervision by faculty members whenever she attended patients. See id. at 407, 99 S.Ct. at 2367
 
 
 [37]
 See Office of Personnel Management, supra note 26, at 31 (App., supra note 3, at 48a):
 It is important to remember that disability alone is not enough to qualify a person under (this program). There must be evidence that the individual is disabled in such a way as to greatly reduce his or her opportunities for competitive appointment to the position involved. This does not necessarily mean that the individual could not take or would inevitably fail a competitive examination, but it does mean that, due to disability(,) he or she would not normally be expected to obtain the appointment under competitive rules. Most important is the limitation of the individual's overall ability to find and keep a job.
 This language is basically unchanged from earlier versions of the selective placement handbook.
 
 
 [38]
 A Chain of Cooperation, supra note 16, at 14
 
 
 [39]
 See 1976 Hearings, supra note 20, at 846 (statement of R. Hampton):
 In the past year, more than 550 visually handicapped and deaf applicants have taken the special forms of the Professional and Administrative Career Examination (PACE). Their performance as a group has been comparable to that of nonhandicapped applicants. This result is particularly significant for deaf applicants, who in the past had a very low pass rate on such tests as the Federal Service Entrance Examination. There is evidence that if the deaf applicants had taken the regular PACE this year only 15 percent would have received an "eligible" rating, compared to the 40 percent who were rated "eligible" on the PACE for deaf applicants. (PACE for deaf applicants is not easier than the regular PACE; the two tests are equated in difficulty using statistics obtained from hearing applicants.)
 (Emphasis added.) Note that the nondiscriminatory tests to which Mr. Hampton referred were given for the first time in 1975, two years after Mr. Shirey sought federal employment. See also id. at 1558 (statement of J. Ottina).
 
 
 [40]
 Memorandum Opinion filed August 29, 1980, D.D.C.Civil Action No. 78-2177, at 7 (App., supra note 3, at 12a)
 
 
 [41]
 See note 5 supra and accompanying text
 
 
 [42]
 Compare Southeastern Community College v. Davis, supra note 36, 442 U.S. at 410-413, 99 S.Ct. at 2369-70 (modification requirement not authorized under § 504 because there is no affirmative action requirement under that section); Coleman v. Darden, 595 F.2d 533, 540 (10th Cir. 1979) (no need to appoint blind person to position for which ability to read is a reasonable requirement)
 
 
 [43]
 See Letter from A. Campbell, Chairman, U.S. Civil Service Commission, to J. McIntyre, Director, Office of Management and Budget (Oct. 12, 1978) (App., supra note 3, at 50a): "An Executive order permitting conversion would * * * give impetus to affirmative action programs for hiring the handicapped without compromising competitive principles." In its affirmative action plan for 1979 NASA itself identified the different promotion opportunities for excepted service employees as a "drawback" of its excepted service appointment scheme. Accordingly, it determined to support issuance of Executive Order 12125, then under consideration. See App., supra note 3, at 49a, 52a-55a
 
 
 [44]
 This is doubtless true, but government figures are hard to come by and harder to evaluate. In 1976 the chairman of the Civil Service Commission told the Senate that he did not know how many handicapped employees were in the competitive service. See note 20 supra. A 1978 Comptroller General's report stated on one page that in 1977 the federal government employed 140,808 handicapped persons, or 6.6% of the federal workforce, and on another page that as of December 31, 1976 the government employed 73,457 handicapped persons, or 2.8% of the federal workforce. Comptroller General of the United States, Federal Employment of Handicapped People 1, 17 (1978). It is fairly certain that the government did not double the number of handicapped people it employed in one year. The discrepancy between the two figures points up the lack of any clear definition as to who is handicapped and who is not. The gross numbers also fail to disclose what jobs are being performed by the handicapped employees
 
 
 [45]
 See 29 U.S.C. § 706(7) (Supp. III 1979); cf. New York City Transit Authority v. Beazer, 440 U.S. 568, 580-581, 99 S.Ct. 1355, 1362-63, 59 L.Ed.2d 587 (1979) (suggesting that individuals on methadone maintenance programs may come within the Rehabilitation Act's definition of handicapped). Jacobus tenBroek, one of our great constitutional scholars-and one who happened to be blind-has criticized the tendency on the part of officialdom to overgeneralize about the handicapped:
 Failure to make necessary distinctions among the varieties of physical disability is common alike to popular and professional thought, with consequences often destructive to the effectiveness of social provisions intended for welfare and rehabilitation. * * *
 Over-inclusive classification of the physically disabled, in public law and programming, results among other things from routine pressures toward administrative simplification and convenience. * * *
 tenBroek & Matson, supra note 25, 54 Calif.L.Rev. at 811.
 
 
 [46]
 Cf. Kampmeier v. Nyquist, 553 F.2d 296 (2d Cir. 1977) (under § 504 state has substantial justification for denying children with only one eye opportunity to participate in contact sports)
 We express no opinion, of course, as to whether § 501 and § 505 require or permit more than mere equal treatment-i.e., some reasonable degree of modification to accommodate certain handicaps. See Southeastern Community College v. Davis, supra note 36, 442 U.S. at 410-411, 99 S.Ct. at 2369-70; Lloyd v. Regional Transportation Authority, 548 F.2d 1277 (7th Cir. 1977). It is also worth emphasizing that, although we have not subjected NASA's program to the substantive standards of Title VII, see note 30 supra and accompanying text, the law of Title VII provides no additional basis for sustaining the District Court's order. The test for "disparate impact" is surely satisfied where an employer expressly and intentionally classifies employees on the basis of physical disability, even though they must be found qualified to perform their jobs in order to become employed, and then places a special burden on the segregated group. Cf. Nashville Gas Co. v. Satty, 434 U.S. 136, 140-142, 98 S.Ct. 347, 348, 350-51, 54 L.Ed.2d 356 (1977). No "business necessity" requires permanent denial of employment benefits because of the original manner of appointment. See id. at 143, 98 S.Ct. at 352; Griggs v. Duke Power Co., 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971). Executive Order 12125 has settled that the government's legitimate objective of fostering the merit system can be accommodated under a scheme less burdensome to handicapped employees. See Albemarle Paper Co. v. Moody, 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975).
 Even under the APA review which courts applied to § 501 before § 505 was enacted, see McNutt v. Hills, 426 F.Supp. 990 (D.D.C.1977), we would be hard pressed to sustain this program, were the question raised properly. See 5 U.S.C. § 706 (1976). The excepted service appointment system antedated § 501 by nearly a decade. We have found no indication-in the record or outside it-that responsible civil service authorities ever considered whether the Rehabilitation Act required adjusting the job tenure protection aspects of the program. See Appeal of Edward N. Shirey, FEAA Decision No. DCQ35180197. In that light we could hardly find that the Commission, charged with enforcing § 501, had considered all relevant factors. Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971); Doe v. Hampton, supra note 1, 566 F.2d at 271 & n.15; cf. Ryan v. Federal Deposit Insurance Corp., supra note 1, 565 F.2d at 763 (failure to provide procedures for challenging employment discrimination on the basis of handicap renders plan invalid under § 501) (dictum).
 
 
 [47]
 See Defendant NASA's Answers to Certain of Plaintiff's Second Set of Interrogatories at 3-4, Shirey v. Campbell, D.D.C.Civil Action No. 78-2177, filed February 8, 1980
 
 
 [48]
 We note, however, that the only proper defendant under § 717 of Title VII, as incorporated by § 505, is the Administrator of NASA, in his official capacity. See 42 U.S.C. § 2000e-16(c) (1976)
 
 
 [1]
 One aspect of the majority opinion with which I wholeheartedly agree is its self-confessed "narrow" precedential effect. See majority opinion (maj. op.) at 1200, 1205
 
 
 [2]
 Section 2103 of title 5 of the United States Code defines the "excepted service" as those civil service positions that are "not in the competitive service or the Senior Executive Service." 5 U.S.C. § 2103(a) (Supp. III 1979). The President has been given the authority to except positions from the competitive service, 5 U.S.C. § 3302(1) (1976), and Congress has excepted certain positions from the competitive service by statute. This authority has in turn been delegated to the Office of Personnel Management, the successor of the Civil Service Commission. Executive Order No. 10577, Rule VI, 3 C.F.R. 222 (1954-58 Comp.), reprinted as amended, 5 U.S.C. § 3301 app. at 375 (1976), and 5 U.S.C. § 3301 app. at 155 (Supp. III 1979)
 The Commission over the years has created a large number of excepted service positions, with the unifying characteristics of such appointment being either the impracticability of competitive processes or the confidential, policymaking nature of the positions at issue. See 5 C.F.R. §§ 213.3101, .3201, .3301 (1981). The excepted service includes, as might be expected, the senior policymaking officials of the federal government. See 5 C.F.R. §§ 213.3301-. 3399 (1981). It encompasses a variety of nonconfidential positions as well, including attorneys, interpreters, temporary scientific, researchers, White House Fellows, and physicians employed under contract. See generally 5 C.F.R. § 213.3102 (1981).
 
 
 [3]
 Maj. op. at 1191-1193
 
 
 [4]
 The Civil Service Commission promulgated during the 1960's two provisions permitting persons with severe mental or physical handicaps to obtain civil service appointments through the excepted service. The currently applicable regulations containing this authority are found as subsections (t) and (u) of 5 C.F.R. § 213.3102 (1981). Subsection (t) permits mentally retarded persons to be given positions outside the competitive process, while subsection (u) contains a similar authorization for persons afflicted by severe physical handicaps
 
 
 [5]
 Mr. Shirey was hired under the excepted service authority then provided by 5 C.F.R. § 213.3102(u) (1973). At that time, subsection (u) provided:
 Positions when filled by severely physically handicapped persons who: (1) Under a temporary appointment have demonstrated their ability to perform the duties satisfactorily; or (2) have been certified by counselors of State vocational rehabilitation agencies or the Veterans Administration as likely to succeed in the performance of the duties.
 Id. Mr. Shirey was adjudged "technically, physically, and socially competent"-and presumably, therefore, "likely to succeed"-by officials of the National Technical Institute for the Deaf of the Rochester Institute of Technology. See Appellants' Appendix (A.A.) at 35a-36a.
 
 
 [6]
 See Plaintiffs' First Amended Complaint at P 13, Shirey v. Campbell, No. 78-2177 (D.D.C. Aug. 29, 1980)
 
 
 [7]
 Maj. op. at 1202 (emphasis added)
 
 
 [8]
 It should be noted that Mr. Shirey does not allege that the competitive procedures that obtained in 1973 or thereafter would have discriminated against him had he applied for a position in the competitive service. See generally Brief for Appellants at 3-9
 
 
 [9]
 Prior to the 1979 Executive Order that gave handicapped excepted service employees the opportunity to transfer to the competitive service as a matter of right, Executive Order No. 12125, 44 Fed.Reg. 16879 (1979), codified at 5 C.F.R. §§ 213.3102(t)-(u) (1981), handicapped excepted service employees could apply for a discretionary conversion to the competitive service. In October of 1977, Mr. Shirey, before the announcement of the reduction in force that led to the loss of his job, applied for such a conversion. Brief for Appellees at 7. His request was pending at the time he was discharged. Id. at 7-8
 
 
 [10]
 See maj. op. at 1203; see also note 16, infra
 
 
 [11]
 Maj. op. at 1189-1190 (emphasis added)
 
 
 [12]
 Id. at 10
 
 
 [13]
 Shirey v. Campbell, No. 78-2177 (D.D.C. Aug. 29, 1980), Memorandum Opinion at 8-9; A.A. at 13a-14a
 
 
 [14]
 See maj. op. at 1190
 
 
 [15]
 Shirey v. Campbell, Memorandum Opinion at 6; A.A. at 11a
 
 
 [16]
 In a phrase I find peculiar in its conclusory nature on a matter of some significance in this case, the majority opines that Mr. Shirey's decision to accept an excepted service appointment as opposed to pursuing a position in the competitive service was not a voluntary one. This observation bears repetition in its entirety: "Nor was (Mr. Shirey's appointment) a 'voluntary' choice, as the District Court seems to have thought, except to the extent that the desire to be treated fairly is also voluntary." Maj. op. at 1203 (footnote omitted). Quite apart from the difficulty I have in deducing the meaning of this elliptical statement, the implication that Mr. Shirey's decision was "involuntary" is entirely unsupported in the record. The majority simply concludes, without a whit of supporting evidence, that the district court's conclusion on this matter was in error
 I noted at the outset that this case involves a sleight-of-hand. This is apparent, I believe, when one examines the critical pages of the court's analysis, pp. 1202-1203. The majority's rhetoric there effectively transforms this case from a challenge to disparate treatment into a challenge to the competitive testing procedures that obtained at the time Mr. Shirey was given his position. The court suggests, for example, that these procedures discriminated against the deaf, maj. op. at 1202, and then bootstraps that "past discrimination" into affirmative relief for Mr. Shirey. As I noted earlier, however, this case is not one in which the competitive testing system has been challenged as discriminatory, and the majority's observations on that score, with respect, simply obscure the issues that we must resolve. Mr. Shirey has not alleged that the tests discriminated against him; nor has he contended that his appointment was involuntary in the sense that his deafness impermissibly disadvantaged him in the competitive system. Rather, as Mr. Shirey himself notes, the question presented in this appeal is whether the government's policy of denying equal job retention rights to handicapped excepted service employees violates the nondiscrimination mandate of section 501. See Supplemental Brief for Appellants at 1. Simply put, we are concerned in this case with the disparate treatment of excepted service employees, and not with the equities of the competitive testing process.