633 F.2d 1258
 28 Fair Empl.Prac.Cas. 307,
24 Empl. Prac. Dec. P 31,227, 1 A.D. Cases 233
 Arthur FOWLER, Plaintiff-Appellant,
v.
The UNITED STATES; The General Services Administration; Jay
Solomon, in his individual and official capacity as
Administrator of the General Services Administration; the
United States Civil Service Commission; and Alan Campbell,
Jules Sugarman, and Ursa Posten, individually and as members
of the United States Civil Service Commission, Defendants-Appellees.
 No. 79-1588.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Feb. 14, 1980.
Decided Sept. 10, 1980.
 
 1
 Stuart R. Berkowitz, Legal Services of Eastern Missouri, St. Louis, Mo., for plaintiff-appellant.
 
 
 2
 Bruce D. White, Asst. U. S. Atty., St. Louis, Mo. (argued), and Robert D. Kingsland, U. S. Atty., St. Louis, Mo., on brief, for defendants-appellees.
 
 
 3
 Before STEPHENSON and McMILLIAN, Circuit Judges, and SCHATZ,* District Judge.
 
 
 4
 SCHATZ, District Judge.
 
 
 5
 Plaintiff-appellant, Arthur Fowler, is a mentally retarded person who was hired as a custodial laborer by the United States General Services Administration in 1966 under the provisions for excepted service government employment contained at 5 C.F.R. § 213-3102(t), infra. After working successfully at that job for a period of slightly over ten years, Fowler was fired. At the time of appellant's termination, federal law permitted mentally retarded workers in the excepted service to be summarily discharged, regardless of their length of service, without an opportunity for a prior hearing and without a right to challenge the adverse decision by administrative review, both of which rights were available to competitive service government workers. In the court below,[1] and again on appeal to this court, Fowler has claimed that his summary termination from federal employment violates rights secured by the Fifth Amendment in that:
 
 
 6
 1. Summary termination from government employment denies to mentally retarded workers the guarantees of procedural due process; and
 
 
 7
 2. The classification of mentally retarded workers into excepted service allows unwarranted disparate treatment between retarded individuals and similarly situated non-retarded workers in violation of the equal protection strand of the Fifth Amendment.
 
 
 8
 The district court granted summary judgment in favor of the defendants. In an unpublished memorandum opinion, that court held that the statutory scheme under which Fowler was hired does not create a protected expectation of continued federal employment and, therefore, that Fowler's discharge did not implicate the due process clause. The opinion is silent as to Fowler's equal protection claim. On appeal, plaintiff has renewed and we have examined each of his two asserted grounds for relief. On the latter ground only, we reverse the judgment of the district court.[2]
 
 BACKGROUND
 
 9
 Historically, the government, like other employers, enjoyed a virtually unfettered discretion in regulating the employment relationship. "For almost the first century of our national existence, federal employment was regarded as an item of patronage, which could be granted, withheld, or withdrawn for whatever reasons might appeal to the responsible executive hiring officer." Arnett v. Kennedy, 416 U.S. 134, 148, 94 S.Ct. 1633, 1641, 40 L.Ed.2d 15 (1974); see also Cafeteria & Restaurant Workers Local 743 v. McElroy, 367 U.S. 886, 896, 81 S.Ct. 1743, 1749, 6 L.Ed.2d 1230 (1961).
 
 
 10
 Eventually, in response to growing public demand for civil service reform, Congress passed the Pendleton Act in 1883 and, finally, the Lloyd-LaFollette Act in 1912. The Pendleton Act provided for the creation of a classified civil service and laid the foundation for modern notions of competitive government service by requiring the examination of applicants for entry into classified positions. The Lloyd-LaFollette Act, as now codified at 5 U.S.C. § 7513, extends to employees in competitive service both substantive and procedural guarantees. Subdivision (a) of that section provides that a person employed in a competitive service position can be removed from his job "only for such cause as will promote the efficiency of the service." Subdivision (b) establishes the following procedural mechanism for enforcement of the substantive right:
 
 
 11
 (b) An employee against whom an action is proposed is entitled to-
 
 
 12
 (1) at least 30 days' advance written notice, unless there is reasonable cause to believe the employee has committed a crime for which a sentence of imprisonment may be imposed, stating the specific reasons for the proposed action;
 
 
 13
 (2) a reasonable time, but not less than seven days, to answer orally and in writing and to furnish affidavits and other documentary evidence in support of the answer;
 
 
 14
 (3) be represented by an attorney or other representative; and
 
 
 15
 (4) a written decision and the specific reasons therefor at the earliest practicable date.
 
 
 16
 While the above provisions extended significant and theretofore unknown benefits to a broad class of federal employees, the rights thus conferred remain dependent upon the statutes creating them. The government is generally free to withhold, and has withheld, such benefits from a variety of other federal positions. The authority to except positions from the requirements of competitive entrance, and hence from the guarantees of Section 7513, is expressly conferred in 5 U.S.C. §§ 3301 and 3302. Pursuant to that authorization, the Office of Personnel Management (formerly the Civil Service Commission) has promulgated administrative Rule VI, appearing at 5 C.F.R. § 6.1 et seq., which defines generally the extent of excepted government service. Section 6.2 of Rule VI states as follows:
 
 
 17
 The Commission shall list positions that it excepts from the competitive service in Schedules A, B and C, which schedule shall constitute parts of this rule, as follows:
 
 
 18
 Schedule A. Positions other than those of a confidential or policy- determining character for which it is not practicable to examine shall be listed in Schedule A.
 
 
 19
 Schedule B. Positions other than those of a confidential or policy-determining character for which it is not practicable to hold a competitive examination shall be listed in Schedule B. Appointments to these positions shall be subject to such noncompetitive examination as may be prescribed by the Commission.
 
 
 20
 Schedule C. Positions of a confidential or policy-determining character shall be listed in Schedule C.
 
 
 21
 Excepted positions comprising Schedules A, B and C now appear as Part 213 of the Code of Federal Regulations, 5 C.F.R. §§ 213-3101 to 213-3396. Employees in the excepted service are not covered by the substantive and procedural protections of Section 7513.
 
 
 22
 It is against the backdrop of this legislative scheme that this court must consider the employment status of mentally retarded workers and, in that context, appellant's claim that his summary termination from federal employment violated rights protected by the Fifth Amendment.
 
 
 23
 Until the early 1960's, federal employment opportunities for the mentally retarded were extremely limited, owing, as noted in the government's brief, to "factors such as examinations required for positions in the Competitive Service, lack of understanding of the retarded person's ability to perform in a competitive work setting, and prejudice." In February of 1963, President Kennedy proposed a comprehensive national program designed to eliminate those barriers and thereby facilitate the entrance of mentally retarded persons into the federal work force. The beginning point of that program, which is in effect today, was the use of Schedule A authority to accept mentally retarded applicants from the requirements of competitive examination as a condition to federal employment. As presently constituted, that exception appears as follows at 5 C.F.R. § 213-3012(t):
 
 
 24
 (t) Positions when filled by mentally retarded persons in accordance with written agreements executed between an agency and the Commission. Provisions to be included in such agreements are specified in the Federal Personnel Manual.
 
 
 25
 While this exception eliminated a substantial barrier to employment of the mentally retarded, no provision was made until 1979 for such employees to acquire competitive status or the benefits attendant thereto except by taking the particular competitive examination prescribed for the position applied for. On March 15, 1979, President Carter issued Executive Order No. 12125, which states in part:
 
 
 26
 (I)n order to permit severely physically handicapped and mentally retarded individuals to obtain civil service competitive status, Civil Service Rule 3.1 (5 C.F.R. 3.1) is hereby amended by adding the following new subsection:
 
 
 27
 (b) Upon recommendation by the employing agency and subject to such requirements as the Office of Personnel Management may prescribe, the following classes of handicapped employees may acquire competitive status without competitive examination:
 
 
 28
 (2) A mentally retarded employee who completes at least two years of satisfactory service in a position excepted from the competitive service.
 
 
 29
 Under current regulations, federal agencies seeking to hire the mentally retarded work closely with the various state vocational rehabilitation agencies to ascertain the retarded applicant's fitness for federal service. To that end, federal employers are required to execute a written agreement with the Office of Personnel Management (OPM) providing, among other things, the following:
 
 
 30
 (1) A statement by the agency of its support of the program and a statement of the specific positions, titles, grades and tasks to be assigned the mentally retarded to be employed * * *.
 
 
 31
 (2) A statement by the agency that prior to employing a mentally retarded person it will have obtained a certificate from the appropriate State vocational rehabilitation agency that the retarded person (a) has the ability to perform the duties of the position, (b) is physically qualified to do the work without hazard to himself or to others, and (c) is socially competent to maintain himself in a work environment and either independently or with such continuing help as has been provided for him other than by the employing agency, in after-working hours living.
 
 
 32
 (4) A statement that the agency will not terminate a mentally retarded person's employment without prior notification of the counselor concerned. Generally, appointments under this Schedule A authority will be made on a continuing basis without time limitation, but this does not rule out the possibility that temporary assignments will be worked out with the employee's counselor. (NOTE: The provision for prior notification of the counselor in the event of termination of a mentally retarded person's employment will ensure that necessary immediate arrangements are made for continued rehabilitation and other assistance.)
 
 
 33
 On January 20, 1964, the United States General Services Administration (GSA) executed and submitted to the OPM a written statement in conformity with the above requirements. Under authority of that agreement, plaintiff Arthur Fowler was hired by GSA on December 6, 1966, to be a custodial laborer at the federal center in St. Louis, Missouri. The record contains ten written evaluations of Fowler's job performance rendered over the course of the ensuing ten years. In each instance, Fowler's performance fell well within the "satisfactory" range for each rated category, with frequent ratings of "above average" and occasional ratings of "outstanding." In March, 1971, Fowler was given a cash award in recognition of "continuous work performance that substantially exceeds normal requirements in one or more important job elements over an extended period." Subsequent job evaluations continued to be favorable. Then, on September 9, 1977, Fowler was given the following written notification:
 
 
 34
 The attached Standard Form 50, Notification of Personnel Action, and this letter constitute formal written notice that your employment with the General Services Administration is terminated effective midnight, Friday, September 9, 1977. This action is being taken to promote the efficiency of the service; your disorderly conduct in threatening your supervisor on May 3, 1977 demonstrates that you can no longer perform efficiently as a custodial laborer.
 
 
 35
 This lawsuit followed.
 
 PROCEDURAL DUE PROCESS
 
 36
 Addressing the merits of this appeal, we quickly dispose of Fowler's contention that his summary termination deprived him of procedural due process. In doing so, we begin with the proposition that the requirements of procedural due process apply only to deprivations of constitutionally protected interests in liberty and property. We agree with the district court that neither interest was implicated in the instant case.
 
 
 37
 In determining whether Fowler had a property interest in his job sufficient to invoke due process guarantees, we must look to the statutes and regulations governing the terms of his employment. Board of Regents v. Roth, 408 U.S. 564, 577-78, 92 S.Ct. 2701, 2709-10, 33 L.Ed.2d 548 (1972). Clearly, the statutes providing for the employment of mentally retarded persons into excepted government service do not create an express or reasonably implied expectation of continued employment. Moreover, at the time Fowler was fired, there was no provision in the statutes or implementing regulations for his achieving competitive status short of his taking a competitive examination. That being the case, it is the well-recognized rule that federal employees in the excepted service may be terminated at any time, without either a statement of reasons for discharge or adverse action appeal rights. Paige v. Harris, 584 F.2d 178, 181 (7th Cir. 1978); Elkin v. Roudebush, 564 F.2d 810, 812 (8th Cir. 1977). Accordingly, we find no basis for concluding that Fowler had a constitutionally protected property interest in his job at the time of his termination.
 
 
 38
 Nor do we find any support in the record for a conclusion that Fowler's discharge was handled in such a manner as to deprive him of a protected liberty interest. Fowler does not contend that in terminating his employment the government made "any charge against him that might seriously damage his standing and associations in his community," or that his termination "imposed on him a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities." Board of Regents v. Roth, supra, 408 U.S. at 573, 92 S.Ct. at 2707. Absent a showing of either a protected liberty or property interest, the district court properly denied Fowler's claim that he had been deprived of a right to procedural due process.
 
 EQUAL PROTECTION
 
 39
 Appellant does not seriously challenge the above conclusions. Instead, he contends that, having extended substantive and procedural benefits to non-retarded custodial laborers, no rational basis exists for the government's withholding such benefits from similarly situated mentally retarded workers and, therefore, that summary termination from employment works an irrational and unlawful discrimination against the retarded worker in violation of the "equal protection strand" of the Fifth Amendment due process clause. In the narrow factual circumstances of this case, we agree.
 
 
 40
 The government, of course, concedes the existence of significant differences between the employment rights of mentally retarded and non-retarded custodial laborers. Its defense of that differential treatment rests on the premise that the exceptional category embodied in 5 C.F.R. § 213-3102(t), supra, is both beneficial to mentally retarded job applicants and is rationally based. The argument is made, and convincingly so, that the requirement of competitive examination historically posed an unnecessary barrier to employment in many instances, and that elimination of that barrier by the use of Schedule A authority was thus a realistic and fair method of bringing otherwise qualified mentally retarded workers into federal service.
 
 
 41
 So couched, the government's argument is wide of the mark. For it speaks to a matter not here in dispute, namely, whether, in seeking qualified custodial laborers, an employer is justified in using different hiring criteria depending upon whether the candidate is or is not mentally retarded. The government has suggested that an affirmative response to that question is appropriate and we agree. The same, however, does not provide a rationale for treating two custodial laborers differently once they have been found qualified and placed on the job. At most, the government has made a convincing case that it might not have been required to hire appellant in the first instance. But, as we have stated, it is not the entrance requirements that are in dispute. Instead, the issue here is whether the government may withhold from mentally retarded workers a range of employment benefits it has chosen to extend to similarly situated non-retarded workers.
 
 
 42
 Addressing that issue directly, the government responds with the tautology that a mentally retarded and a non-retarded worker are not in fact similarly situated because the one is in the excepted service while the other is in the competitive service and, therefore, governed by different rules. In rejecting this line of reasoning, we do not suggest that the government may not adopt different standards for treating employees it has chosen to situate differently. We hold only that when the government makes that choice, its reason must rest within the realm of rationality. "(A) statutory discrimination between two like classes cannot be rationalized by assigning them different labels * * *." Richardson v. Belcher, 404 U.S. 78, 83, 92 S.Ct. 254, 258, 30 L.Ed.2d 231 (1971). There must actually be a distinction between the two classes worthy of the difference in treatment. Here, the distinction is not based on the nature of the position being filled, but on the nature of the employee filling it.[3] The response to that distinction, as reflected in the exceptional category embodied in 5 C.F.R. § 213-3102(t), supra, has been to use different methods for ascertaining the various applicants' fitness for service.[4] That task having been accomplished, the government has shown this court no rational interest, and we can perceive of none, that would be furthered by the government's retaining the power to summarily discharge without cause a mentally retarded worker, but not a non-retarded worker who performs the same job.
 
 
 43
 In his complaint, Fowler has requested that, in addition to declaratory relief, he be granted reinstatement with full back pay. We hold that Fowler was entitled to the same statutory rights as would be a competitive service employee and that his summary termination deprived him of at least the procedural protections to which he was thus entitled. Fowler was, therefore, wrongfully terminated and is entitled to an appropriate award of back pay. However, there is no way in the present state of the record for this court to determine whether the defendants had sufficient cause to terminate Fowler. Reinstatement, therefore, might not be an appropriate remedy and we decline to pass on that question at this stage.
 
 
 44
 Accordingly, the judgment of the district court is hereby reversed and the case is remanded with directions that the district court enter an appropriate order granting the plaintiff a proper award of back pay and other equitable relief, if any, including reinstatement, to which Fowler might be entitled under the circumstances. Costs on appeal are taxed to the defendants.
 
 
 
 *
 The Honorable Albert G. Schatz, United States District Judge for the District of Nebraska, sitting by designation
 
 
 [1]
 The Honorable James H. Meredith, United States District Judge for the Eastern District of Missouri
 
 
 [2]
 The complaint originally asserted the status of this case as a class action. However, no determination was ever made by the district court as to the maintainability of this action as a class action, and no objection has been made before this court as to that aspect of the case. We, therefore, proceed with our analysis of the merits as to the Fowler claims only
 
 
 [3]
 In that connection, we need not speculate in this case as to whether a rational distinction might be drawn and a difference in employment benefits thereby justified, when there exists an actual difference between the nature of two positions being filled such, for instance, as might be the case between either a retarded or a non-retarded custodial laborer and a retarded or a non-retarded clerk-typist
 
 
 [4]
 It is not necessary to our decision in this case to reach the question of whether, as part of its alternative method for determining the employment compatibility of a mentally retarded applicant, the government may legitimately require a reasonable period of probationary service before conferring on that person the full range of benefits accorded a non-retarded applicant. It is significant to note, however, that the government has recently chosen to do precisely that. Under current regulations a retarded worker can achieve competitive status by successfully performing his job for a period of two years. In view of his long and satisfactory work record, it is obvious that, under those regulations, Fowler would have acquired competitive status long ago