**Ricky NELSON, Plaintiff,**

v.

**Malcolm BALDRIGE, et al., Defendants.**

**No. 83–1345–CV–W–6.**

United States District Court, W.D. Missouri, W.D.

Jan. 20, 1984.

C. David Whipple, Whipple & Kraft, Kansas City, Mo., and Richard J. Hirn, National Weather Service Employees Organization, Washington, D.C., for plaintiff.

Robert G. Ulrich, U.S. Atty., and E. Eugene Harrison, Asst. U.S. Atty., Kansas City, Mo., for defendants.

### MEMORANDUM OPINION AND ORDER

SACHS, District Judge.

Plaintiff Ricky Nelson, a recently discharged printer with the National Weather Service, Department of Commerce, sues for reinstatement and back pay and has applied for a preliminary injunction. His motion was heard on January 13 and 14, 1984, and will now be denied for reasons herein stated.

Nelson asserts race discrimination in federal employment, primarily relying on testimony that his immediate superior angrily made racial references in the course of directing his activities. He also relies on inferences of hostility from allegedly arbitrary conduct, in that both the quantity and quality of his work were acceptable, but he was terminated for failing to be at his post in the printing room at all required times.

As a second cause of action, Nelson asserts a violation of the Rehabilitation Act of 1973, as amended in 1978. 29 U.S.C. § 794. He has been classified as mentally retarded. He obtained his employment in an affirmative action program in 1980, and performed satisfactorily for more than one year. Complaints of irresponsibility in at-

tendance, tardiness and the like, were made in the months prior to his termination. The termination in October of 1983 was summary in nature. Nelson contends that the Director of the Office of Personnel Management, through regulatory exemptions of handicapped persons from the procedural protections accorded regular Civil Service employees, has unjustifiably discriminated against the handicapped in violation of the Rehabilitation Act.

The regulatory limitations on the rights of handicapped federal employees need not be closely considered at this time. Nelson contends that the limited rights set forth in 5 C.F.R. § 213.3102(t) and (u) conflict with the remedial purposes of the Rehabilitation Act and the nondiscrimination principle. He cites *Shirey v. Devine*, 670 F.2d 1188 (D.C.Cir.1982), for requiring that there be no unjustifiable discrimination against handicapped persons in the federal employment system, and that unnecessary burdens be minimized. But the decision itself favorably mentions the opportunity to convert to the competitive service, after two years of employment. 670 F.2d at 1205 (referring to Executive Order 12125, promulgated March 25, 1979). In this litigation Nelson contends the liberalization of the system did not go far enough to comply with the Rehabilitation Act. Much remains to be developed on these issues and the Court simply acknowledges that an issue of substance is presented by plaintiff.[1]

The race discrimination claim is being pursued concurrently in litigation and administratively. Plaintiff forecasts months and even years of administrative delay. The Court's jurisdiction to grant a preliminary injunction is not seriously contested. *See Porter v. Adams*, 639 F.2d 273 (5th Cir.1981).

Although, as discussed below, the Court has responsibility at this time for giving consideration to the likelihood of success of the race discrimination claim, the Court also retains an obligation against forming fixed, premature conclusions. It is deemed adequate, therefore, to offer a very generalized appraisal consistent with such tentative conclusions. The Court has heard evidence that Nelson began his service as a printer very effectively and responsibly, with no evidence of inadequacy based on mental deficiency, but became irresponsible in his attendance and in his application to duty. His supervisor who assumed responsibility in mid-1982, William Winkert, was instructed to keep a log on his activities. Written instructions were issued regulating Nelson's conduct. Unlike other employees, who are not subjected to "regimentation" like "a bunch of factory workers," Nelson was subject to unusual demands. Dr. Richard F. Myers, director of the Weather Service Training Center, considers firm, restrictive supervision to be appropriate, when lax behavior develops. Winkert carried out this objective with thoroughness, but also with a belligerent attitude toward Nelson. He used harsh language, probably including racial references. He probably warned Nelson that he must correct his conduct or he would be unemployed, like other members of his race.

---

1. The parties have not discussed a pertinent Eighth Circuit decision. *Fowler v. United States,* 633 F.2d 1258 (8th Cir.1980). In that case the Court of Appeals ruled that Equal Protection had been denied to a mentally retarded custodial laborer who was summarily discharged for an incident occurring after ten years of successful service. The Eighth Circuit held that since the employee's fitness for service had long been established, there was no rational basis for denying him the procedural rights accruing to employees in the competitive service. The Court found it unnecessary to consider whether the Government could create a special prolonged probationary period applicable to handicapped persons during which summary procedures might be used. 633 F.2d at 1263 n. 4. In the present case, defendants are presumably relying on the validity of the two year probationary period, and on a further contention that Nelson did not "successfully" complete that period so as to prove his fitness for service. The present record does indicate significant problems of attitude and behavior prior to the completion of Nelson's second year (D.Exh. 2, 10) and thereafter (D.Exh. 4, 7) although the record is not consistent (P.Exh. 7; D.Exh. 7, entry of 8/18/82). While the Court views *Fowler* as significantly favoring Nelson, it will not be considered dispositive since it has not been dealt with by the parties.

During the 15 month period of Winkert's supervision, there were probably several references to plaintiff's "black butt."

While there was a conflict in testimony and only two participants, the Court found Nelson's testimony on the racial issue somewhat more credible than that of Winkert. At the hearing Winkert referred to plaintiff's intelligence as being adequate to his job, and apparently comparable to that of other "young black persons." There is reason to believe that Winkert engages in a degree of racial stereotyping and makes uncalculated and needless racial references.

The Court is not prepared to rule that Winkert's supervision of plaintiff or his causal connection with the discharge establishes clear-cut racial discrimination. On a complaint (not by plaintiff) Dr. Myers made an inquiry and received a denial from Winkert as to racial remarks. Dr. Myers made the decision to terminate plaintiff, and Winkert denies responsibility, suggesting, on the contrary, that he was principally concerned with denying plaintiff an increase in grade and salary. Winkert attributes the termination suggestion to a personnel advisor who did not testify at the hearing.

The Court has given consideration to all elements of the four part test for granting a preliminary injunction, as stated in *Dataphase Systems, Inc. v. C L Systems, Inc.*, 640 F.2d 109 (8th Cir.1981) (en banc). The balance of hardships favors the plaintiff, although defendant would have some problems of adjustment if relief were granted, in that the printing operation at the Training Center has been discontinued. The public interest question mirrors the question as to plaintiff's likelihood of success. While the Court is not prepared to announce an impression that plaintiff's success is "probable," there are certainly fair grounds for litigation and the combined effect of plaintiff's two contentions carries him, in the Court's preliminary appraisal, well into the range of the fifty percent mark.

The Court is unable at this time, however, to rule for plaintiff on the critical test

(640 F.2d at 114 n. 9), the claim of irreparable injury, if the Court uses the approach believed to be mandated by the Supreme Court in *Sampson v. Murray*, 415 U.S. 61, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974). For better or worse, this Court views *Sampson* as a seriously inhibiting decision when an employee or former employee seeks reinstatement or job tenure pending litigation. *Lee v. Consol. School District No. 4 of Grandview*, 494 F.Supp. 987, 990 (W.D.Mo. 1980).

The *Sampson* decision was, in its context, like the present case in that it dealt with federal employment; as the Court supposed in *Lee*, it also seems pertinent to state and local governmental employment. *Sampson* has also been used for guidance of district courts in considering claims for relief pending litigation in private employment controversies involving alleged violation of federal law, as in Title VII cases. E.g., *Holt v. Continental Group, Inc.*, 708 F.2d 87, 91 (2d Cir.1983), *cert denied* ___ U.S. ___, 104 S.Ct. 1294, 79 L.Ed.2d 695 (1983); *Theodore v. Elmhurst College*, 421 F.Supp. 355 (N.D.Ill.1976).

As succinctly stated by Judge Newman, *Sampson* rules that the "requisite irreparable harm is not shown in employee discharge cases by financial distress or inability to find other employment, unless truly extraordinary circumstances are shown." *Holt*, 708 F.2d at 90–91. *Sampson* means that a discharge from employment "will seldom rise to the level of irreparable harm" for purposes of interim relief, given the possibility of reinstatement and back pay if the plaintiff is ultimately successful. *EEOC v. Anchor Hocking Corp.*, 666 F.2d 1037, 1040, 1044 (6th Cir.1981). The majority in *Sampson* held that a "temporary" loss of income, and a claim of damage to reputation, would fall "far short" of a contention that would merit a preliminary injunction reinstating or freezing employment pending litigation. 415 U.S. at 90, 91, 94 S.Ct. at 952, 953. No matter how "severely they may affect a particular individual," an "insufficiency of savings" or "dif-

ficulties in immediately obtaining other employment" are deemed to be sufficiently "common to most discharged employees" so as to preclude interim relief. *Id.* at 93 n. 68, 94 S.Ct. at 953 n. 68. The dissenting justices protested the harshness of the *Sampson* rule, *id.* at 101–02, 94 S.Ct. at 958–59, but it now seems controlling on federal trial court discretion in employee discharge cases.

Developments in the law since *Sampson* was announced in 1974 have not clarified the exception for "so-called 'extraordinary cases,' whatever they may be." *Id.* at 100, 94 S.Ct. at 958 (Marshall, J., dissenting). Lacking descriptive circumstances, the Court resorts to thinking in quantitative terms, necessarily excluding reliance on difficulties that may be severe, but would arise with some frequency.

In the present case, plaintiff and his wife have lost their apartment and automobile, and have no medical insurance. Neither has found employment. There have been unexplained delays in obtaining food stamp authorization or unemployment compensation. The couple has been living in cramped quarters in his mother-in-law's home. While food stamps and unemployment compensation may soon be available, plaintiff's job prospects are somewhat dimmed by his mental handicap. These circumstances, in total, do seem unusually severe, though not beyond what Justice Marshall anticipated in his dissent. *Id.* at 101, 94 S.Ct. at 958. The Court does not believe they may be treated as "genuinely extraordinary," so as to qualify for the exception noted in the majority opinion in *Sampson*. *Id.* at 92 n. 68, 94 S.Ct. at 953 n. 68.

If the Nelsons were without family resources and were indefinitely cut off from community assistance an extraordinary situation probably would be posed. The Court previously tried a Title VII case (unfortunately lacking in merit) in which the plaintiff testified that his poverty literally had forced him into the streets. Genuinely extraordinary injury probably also would be posed if plaintiff's handicap were such that he would have very little chance of obtaining further employment. In this instance, however, the mental handicap (supposedly established by a low IQ rating) is not readily noticeable and apparently has not interfered with able handling of a job which appears to have been mentally demanding.

At the suggestion of plaintiff and his wife, plaintiff's counsel has shown that shortly after plaintiff's termination his wife suffered a miscarriage, which a doctor attributed to inadequate diet. Counsel does not assert a causal relationship with the loss of employment, and in any event the loss asserted is not one which the remedial powers of the Court could reach.

Plaintiff seeks to escape the harsh effect of *Sampson* by offering various distinctions. Some courts have explained *Sampson* as a case involving exhaustion of administrative remedies. *Bishop v. Tice*, 622 F.2d 349, 363 (8th Cir.1980) (Floyd R. Gibson, J., dissenting). While definitely a factor, the Court does not read the *Sampson* restriction as being limited to instances where prompt administrative relief is possible.

Unlike the present case, *Sampson* was a case in which plaintiff had not fully specified her injuries. The Supreme Court was, however, clearly announcing a ruling of broad application. The majority had assumed financial embarrassment and an inability to easily obtain substitute employment.

Plaintiff's major effort toward distinguishing *Sampson* relies on a ruling by Chief Judge Motley in a race discrimination case. *Gibson v. U.S. Immigration & Naturalization Service*, 541 F.Supp. 131 (S.D. N.Y.1982). *Gibson* involved claims of race discrimination in employment by a federal agency, and retaliatory harassment, likely to result in loss of income. The claim of irreparable injury may factually have been somewhat stronger in *Gibson* than in the present case, in that the difficulties of proving damages from a lateral move or reassignment may be inherently greater than proving damages for a wrongful ter-

mination. Judge Motley's opinion reaches out, however, to establish a major exception to the *Sampson* principle, under which race discrimination claims and other Title VII cases would be *presumed* to involve irreparable injury "from the loss of human dignity which such violations engender." 541 F.Supp. at 136.

A Fifth Circuit decision shortly before *Gibson* adopts the same rationale, presuming irreparable injury as an exception to *Sampson* when employment discrimination is charged. *Middleton-Keirn v. Stone,* 655 F.2d 609, 612 (5th Cir.1981). *See also United States v. Jefferson County,* 720 F.2d 1511, 1520 (11th Cir.1983) (referring to a Fifth and Eleventh Circuit presumption of irreparable harm in discrimination cases after administrative remedies have been exhausted.)

The rule in the two Southern circuits may not truly support *Gibson,* however. A decision by Judge Wisdom acknowledges that *Sampson* changed the rule in employment discrimination cases involving federal employees, so that irreparable injury must now be demonstrated (not simply presumed) as "an essential prerequisite to preliminary injunctive relief ..." *Porter v. Adams,* 639 F.2d 273, 278 n. 8 (5th Cir. 1981). The *Gibson* decision itself acknowledges that *Porter* is contrary authority; it also acknowledges that the Sixth Circuit decision in *EEOC v. Anchor Hocking, Corp.,* 666 F.2d 1037 (6th Cir.1981), is contrary. This Court also believes that the Second Circuit decision in *Holt v. Continental Group, Inc.,* 708 F.2d 87 (2d Cir. 1983), effectively supersedes the district court decision in *Gibson.*

Despite some law to the contrary, therefore, the weight of authority rejects the *Gibson* and *Middleton-Keirn* presumption of irreparable injury in employment discrimination cases. This Court concludes that the full showing of truly extraordinary circumstances, required by the Supreme Court in *Sampson,* must be made in em-

ployment discrimination cases prior to a granting of interim relief, and that such a showing has not been made.

The Court acknowledges a further complication. In Judge Newman's *Holt* decision, he remanded for a reconsideration of whether there should be interim reinstatement in order to avoid the "chilling effect" on other employees of the employer's allegedly retaliatory action. The Second Circuit characterized this as an "irreparable injury" consideration. With due deference, this Court believes the retaliation issue more nearly involves the "public interest" consideration, and may not satisfy the *Sampson* requirement that plaintiff show irreparable injury to himself.[2] Such irreparable injury also seems to be a prerequisite to relief under footnote 9 in *Dataphase,* which declares that "under any test the movant is required to show the threat of irreparable harm." 640 F.2d at 114. In any event, no overriding public interest consideration appears in this case which would itself require interim relief.

For the foregoing reasons the motion for a preliminary injunction is hereby DENIED.

---

2. The effect of the retaliation claim is apparently the issue currently on appeal before the Supreme Court. 52 U.S.L.W. at 2326.