**INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, AFL–CIO, and Air Transport District Lodge 142, International Association of Machinists and Aerospace Workers, Plaintiffs,**

v.

**TRANS WORLD AIRLINES, INC., Defendant.**

**No. 84–6167–CV–SJ.**

United States District Court, W.D. Missouri, St. Joseph Division.

Jan. 30, 1985.

Michael D. Gordon, Janae L. Schaeffer, Jolley, Moran, Walsh, Hager & Gordon, Kansas City, Mo., for plaintiffs.

Dick H. Woods, Sr., Paul E. Donnelly, Dennis E. Garvin, Stinson, Mag & Fizzell, Kansas City, Mo., for defendant.

## MEMORANDUM AND ORDER

SACHS, District Judge.

This lawsuit against Trans World Airlines, Inc. (TWA) was filed on December 19, 1984, by District 142 of the Machinists Union (IAM) and by the International Union, seeking injunctive relief protecting the job assignments of TWA mechanics, some of whom are scheduled to be furloughed. The unions contend that TWA is taking action that would be in violation of the status quo provisions of Section 6 of the Railway Labor Act (45 U.S.C. § 156) in that, pending negotiations of a new contract, TWA is attempting unilaterally to alter the rules or working conditions pertaining to mechanics. In the alternative, the unions contend that if TWA's actions are arguably authorized by the 1983 collective bargaining agreement, and the dispute is characterized as a "minor" one, subject to arbitration, injunctive relief should be granted preserving the status quo pending arbitration, so as to avoid irreparable harm to affected employees.

The principal controversy before the court involves discontinuance of mechanics' work relating to the departure of aircraft and the substituting by TWA of ramp servicemen for signaling and related activities. TWA has recently begun using "powerback" departures at stations where mechanics are staffed. Under a powerback system, the aircraft moves away from the terminal by backing up under its own pow-

er, rather than being towed or pushed. A secondary controversy between the parties, involving possibly two layoffs, would reduce mechanics' work involved in "walk-around" inspections and "logbook checks."

At a conference with counsel on the day suit was filed, when plaintiffs sought a temporary restraining order, TWA agreed to postpone the effective day of furloughs relating to the powerback controversy until February 4, 1985. The court then scheduled a hearing on January 2, 1985, on plaintiffs' motion for a preliminary injunction. In order to accommodate the desired briefing schedule, TWA postponed the initial powerback furloughs until February 18, 1985. In its post-hearing brief filed January 18, 1985, TWA now offers to "continue to withhold any furlough action on those employees affected by implementation of powerback" during the course of arbitration, if arbitration is directed by the court, on the assumption that arbitration will be "conducted and completed within a reasonable time." TWA does not, however, offer to withhold any furloughs resulting from the reduction in walk-around and logbook review activities.

At the hearing, TWA agreed that the record then made would suffice for final disposition of this case. Plaintiffs informally notified the court thereafter that they would rest their claim for permanent relief on the record made at the hearing. *See* January 8, 1985 letter to the court, Document No. 19.

The following opinion is entered in compliance with Rule 52(a), F.R.Civ.P.

## SUMMARY OF PERTINENT FACTS

Mechanics, as the name implies, generally deal with the mechanical aspects of the aviation industry. Their hourly wage rate of about $17.00 is about $3.00 in excess of the hourly wage for ramp servicemen (Tr. I 75, 109), who are also represented by the plaintiff unions. Ramp servicemen's job duties include handling baggage and other cargo, transporting food and supplies, and the servicing of aircraft and automotive equipment with fuel, oil and water. The 1983 IAM–TWA agreement provides, however, that a ramp serviceman "shall not perform any mechanical work of any nature."

As a matter of longstanding practice, where mechanics are employed at a station, they have served as the ground crew used in bringing aircraft into place for unloading and have assisted in the physical departure of aircraft. Receipt and dispatch ground work includes signaling (guiding the aircraft), chocking and unchocking of wheels, and the connection and disconnection of communication and electrical lines.

Mechanics are specifically designated by contract to taxi aircraft, and to perform "towing and pushout". *See* Article 4(a)(7) of the 1983 IAM–TWA agreement, Plaintiffs' Exhibit 7. Tractors are driven by mechanics during the latter activity.

TWA wishes to eliminate mechanics from receipt and dispatch duties. It seeks a contract change reassigning towing and pushouts to ramp servicemen. It contends it already has authority to assign signaling duties and the like to ramp servicemen without a contract change, using the management rights clause in the IAM–TWA collective bargaining agreement. Article 3(c).[1] Where tractors are not needed, as in powerbacks, TWA contends it needs no additional contract authority. The unions contend all arrival and departure ground work at mechanic-staffed stations[2] is contractually guaranteed to mechanics because the contract provides that "the work of a mechanic shall consist of and include any and all work generally recognized as mechanics' work." Article 4(a)(7). The unions assert that historic assignment practices control under this provision, and, moreover, that the pushout provision of the

---

1. "All matters not covered by this Agreement or the Railway Labor Act as amended, shall remain exclusively and without limitation within the prerogative of Management."

2. Of TWA's 63 domestic locations, only 25 are staffed with IAM mechanics. Twenty-nine stations have neither mechanics nor ramp servicemen. *Stipulation,* paragraph 10.

contract was intended to apply comprehensively to all departures of aircraft in mechanic-staffed stations.

In addition to the contract dispute, which is longstanding, the current case presents the question whether, *pending negotiations*, TWA can eliminate mechanics from departure activities by unilaterally instituting the powerback procedure, and using ramp servicemen as ground signalmen who will also unchock wheels and disconnect lines. Although plaintiffs do not contest TWA's contractual right to institute powerback at mechanic-staffed stations, they contend that assignment of receipt and dispatch ground work associated with this procedure to ramp servicemen (at mechanic-staffed stations) is a violation of the Act's status quo provisions.

Furlough notices have been sent or will be sent to about 61 mechanics as the result of using powerback at mechanic-staffed stations and reassigning work to ramp servicemen. Furloughed mechanics will have contract rights to "bump" less senior mechanics or may transfer to other less skilled occupations (presumably bumping ramp servicemen, if willing to take reduced pay) rather than being furloughed or changing stations. Transfers may be to other cities, thus causing residential relocation and family problems. The bumping procedures would probably ultimately affect at least 180 employees, using a TWA estimate tripling the number of persons immediately affected.[3]

In addition to the powerback controversy, a much smaller controversy has arisen because TWA has announced the elimination of certain maintenance operations, which could cause the furloughing of two mechanics somewhere in the TWA system. Specifically, TWA informed the plaintiffs in November, 1984 that implementation of Phase II of the Daily Service Maintenance Program would begin at the first of the year and would consist of eliminating (i) the mechanic walk-around check on through flights and turn-around flights and (ii) the logbook review on turn-around flights. Plaintiffs' Exhibit 15. The walk-around and logbook check functions[4] have been performed by mechanics for the past decade or more at mechanic-staffed stations. (Tr. I 70–71). Although these job tasks are not specified as exclusive mechanics' work in the 1983 IAM–TWA agreement, Article 4(a)(6) does provide that "[a] Lead Mechanic will be required to review aircraft log books." TWA contends that the maintenance changes are authorized by the management rights clause and that this controversy concerns solely a change in the time and place that mechanics' work is performed *by mechanics*. The unions assert that the maintenance changes are a change in the status quo that is untimely during negotiations, if not unauthorized.

In July, 1983, a year before formal contract negotiations began, the union was notified that TWA intended to begin powerback operations at seven stations where there were no mechanics and intended to start powerbacking at other stations subsequently. Plaintiff's Exhibit 18. The notice indicated that ramp servicemen would be used as a ground crew during powerbacking. Prior to November, 1984, TWA never supplied a timetable or other notice of imminent use of powerbacking at stations where mechanics would be relieved of ground crew dispatch duties. A union official apparently objected orally to the July, 1983, notice, insofar as it forecast powerback use without mechanic assistance at mechanic-staffed stations. (Tr. I 98–99)[5]

---

**3.** The number affected could be about 225, using the estimate of 75 powerback furloughs, as contained in TWA's proposed findings of fact, paragraphs 61–62.

**4.** A mechanic walk-around consists of "a check of the aircraft's exterior to assure that access doors are closed, and to look for any obvious damage to the aircraft, its tires or its control services." *Stipulation*, paragraph 23. A me-

chanic log book review involves the reviewing of maintenance records concerning work done or required to be done on a particular aircraft.

**5.** The hearsay objection was waived, except for "double hearsay." (Tr. I 98). Neither participant in the conversation testified. Frank Score, President-General Chairman of District Lodge 142, testified that had he received the July 8, 1983 letter, he "would not have taken issue with

In any event, powerbacking (without using available mechanic ground assistance) was not initially scheduled until several months after new contract negotiations began, in August, 1984, and after the parties had reached a temporary impasse in negotiations.

The 1983 contract had an expiration date of October 31, 1984. Formal notice of negotiations was given by both sides in August, 1984. In advance of formal notice, however, the parties engaged in informal "pre-negotiation negotiation." TWA advised the unions it intended to supplant mechanics in all receipt and dispatch duties, as an important economy measure. It is unclear whether TWA gave notice that it intended to obtain a contract change (other than the elimination of mechanics from "towing and pushouts") or whether it simply indicated an intent to use powerbacking and reassignments under a claim of management rights. TWA was aware that the unions claimed receipt and dispatch duties as "mechanics' work" under the 1983 contract and previous labor agreements. While it is improbable that TWA tacitly conceded that only a contract change would permit reassignment of all receipt and dispatch work from mechanics to ramp servicemen, it is clear that all such work was discussed together as one of six issues needing resolution by agreement. (Tr. I 86–7, 131–2). This could be accomplished by adding new provisions to the contract or simply agreeing on the interpretation of provisions in the existing contract. Change in the "pushback" assignment (one of the receipt and dispatch functions) was later described by TWA as the "cornerstone" of contract negotiations, and as an "absolutely necessary" change. (Tr. I 169–

70). TWA also advised that enlarged use of powerback operations had been withheld to avoid upsetting plaintiffs during contract negotiations and "because they [TWA] felt they could work these things out in the negotiations." (Tr. I 179). *See* Plaintiffs' Exhibit 38, union negotiator's notes, at 4.

On October 23, 1984, TWA advised in writing that the powerback operation had not been previously extended to mechanic-staffed stations because TWA wanted to "create a climate" conducive to negotiating a contractual reassignment of pushback from mechanics to ramp servicemen. Plaintiffs' Exhibit 14. TWA advised, however, that it could no longer "afford to be patient," and would expand its powerback operations into mechanic-staffed stations.

Notices were given by TWA on November 29, 1984, that mechanic walk-arounds and logbook checks would be reduced (Plaintiffs' Exhibit 15) and on November 30, 1984, that powerbacking operations would be expanded, without using mechanics for signaling and incidental activities (Plaintiffs' Exhibit 16). The controversy then became more heated, and this litigation followed.

Additional facts will be referred to, when deemed pertinent, during analysis of the legal issues. Further background information is available in the Stipulation filed by the parties. Document 9. Although the court disagrees with some of TWA's basic legal contentions, few of its proposed findings of fact are in significant controversy.[6]

## "MAJOR DISPUTE" ANALYSIS

The court must first determine whether the powerback litigation involves a "major

---

the letter had it dealt with locations where mechanics were not staffed to utilize other personnel." (Tr. I 100). The immediate change announced in the letter was not threatening to IAM mechanics but the express intention to expand the powerback procedure to mechanic-staffed stations (with ramp servicemen performing the attendant ground functions) should have been of some concern to the unions. Score's testimony suggests a plausible reason why the July 8, 1983 notice was not opposed more vigor-

ously, as by a written complaint—it was perhaps not considered to materially infringe the mechanics' rights because of its limited immediate effect and indefiniteness as to future intent.

**6.** TWA's proposed findings of fact do include some unnecessary characterizations of testimony, argumentative phrasing and the like, but the controversy is essentially legal rather than factual.

dispute," a "minor dispute," or both. Although injunctive relief may flow from either determination, and even from TWA's current offer to delay the powerback furloughs, the characterization has practical significance. If there is simply a "minor dispute," protection of mechanics from furloughs will be dependent on the processing of arbitration, which TWA suggests should be promptly scheduled. If the powerback controversy is a "major dispute," the parties will be required to maintain the status quo during bargaining, mediation, and exhaustion of the processes of the Railway Labor Act, 45 U.S.C. § 156.

Very little discussion is needed to determine that there is *at least* a minor dispute, involving two interpretations of the 1983 collective bargaining agreement. The unions argue, quite plausibly, that since the agreement allocates to mechanics all work that has been previously characterized as mechanics' work and since mechanics have for many years performed all receipt and dispatch ground work at mechanic-staffed stations, these receipt and dispatch activities are exclusively mechanics' work at all stations where mechanics are on duty. They argue, somewhat less literally, that "towing and pushout" work means all receipt and dispatch activities, and has been so understood since the parties adopted the language in the early 1970s as a short-hand reference to the activities performed by mechanics in connection with the arrival and departure of aircraft. TWA argues, also with some plausibility, that the management rights clause allows it to institute powerback operations and to assign ramp servicemen to signaling and other associated ground activities because such operations are new and the supporting activities are unassigned by the contract.

Once the court has found arguable questions for arbitration (a minor dispute) it may be directed, by at least one Eighth Circuit case, to rule summarily that there can be no concurrent major dispute. *United ed Transportation Union v. Burlington Northern, Inc.*, 458 F.2d 354, 356 (8th Cir. 1972). Chief Judge Matthes wrote in that case that a "hybrid approach cannot be sustained. The dispute is either a § 3 minor dispute, or a § 6 major dispute." The citation for this statement was *Elgin, J. & E. Ry. v. Burley*, 325 U.S. 711, 723, 65 S.Ct. 1282, 1289, 89 L.Ed. 1886 (1945), where the Supreme Court defined the major-minor distinction.

The court concludes, however, that it is bound by another Supreme Court case, the lesson from which is dispositive—*Detroit & Toledo Shore Line R. Co. v. United Transportation Union*, 396 U.S. 142, 90 S.Ct. 294, 24 L.Ed.2d 325 (1969). The *Shore Line* case, like the case at bar, involved unilateral action by a carrier during negotiations. The carrier contended it could take the action because it was not forbidden by contract. The Court, speaking through Justice Black, ruled against the carrier, saying the "status quo provisions" of the Railway Labor Act are properly invoked "to preserve and maintain unchanged those actual, objective working conditions and practices, broadly conceived, which were in effect prior to the time the pending dispute arose and which are involved in or related to that dispute." 396 U.S. at 153, 90 S.Ct. at 301. The *Shore Line* case involved a major dispute but no minor dispute (because breach of contract was not claimed), but it seems obvious that if Section 6 is available when a carrier takes contractually permitted action at the wrong time (during negotiations) it would also be available when the carrier's action is both untimely and arguably violative of a contract.[7]

**7.** It may be desirable to distinguish another Eighth Circuit precedent, *Air Lines Pilot Ass'n, International v. Northwest Airlines, Inc.*, 444 F.Supp. 838, 840 (D.Minn.1977), *aff'd*, 570 F.2d 257 (8th Cir.1978), where it was ruled that a party cannot bootstrap itself from a minor dispute into a major dispute by offering to negotiate. *See also Air Cargo, Inc. v. Local Union 851,*

733 F.2d 241, 247 n. 6 (2d Cir.1984). In the case at bar, both parties have sent Section 6 negotiating notices and the previous contract has expired, therefore requiring renegotiation. The court is somewhat troubled, however, by Chief Judge Devitt's language suggesting that the "analytical framework" remains the same, whether or not the parties have entered into a negotiat-

While the *Shore Line* case has not been used in the Eighth Circuit in the manner here suggested, the few precedents in the circuit which cite *Shore Line* are not inconsistent with the result here reached. A Ninth Circuit decision expressly states that a Section 6 status quo injunction is required when one of the parties uses self-help to effect a unilateral change in labor conditions during a negotiating period even though, "standing alone," the issue might be characterized as a minor dispute involving contract interpretation. *O'Donnell v. Wien Air Alaska, Inc.*, 551 F.2d 1141, 1148 (9th Cir.1977).[8]

█ While the possible existence of a breach of contract does not negate the existence of a major dispute, entitlement to Section 6 relief preserving the status quo does depend on whether the challenged action or threat of action concerns matters that are "involved in or related to" the negotiations. 396 U.S. at 153, 90 S.Ct. at 301. A critical issue, therefore, as TWA seems to concede, is whether the subjects of negotiation were "so closely related" to the changes in practice that the status quo must be preserved in order to vindicate the statutory protection of the negotiating process. *Baker v. United Transportation Union*, 455 F.2d 149, 155 n. 13 (3rd Cir. 1971). *See also Reed v. National Air Lines, Inc.*, 524 F.2d 456, 459 (5th Cir. 1975).

█ It seems clear that the powerback furlough program is indeed closely related

to the subjects in negotiation. TWA did not, it is true, seek a contract modification expressly dealing with the powerback practice. That would have been inconsistent with its reading of the 1983 contract. But TWA plainly seeks agreement that "receipt and dispatch" is not reserved for mechanics, whether by new contract language or by an agreed interpretation of the present language. It does seek a change in the contract language, transferring towing and pushouts to ramp servicemen. If this were achieved, it is difficult to imagine a principled argument for retention of mechanics in other apparently more routine "receipt and dispatch" work. Displacement of mechanics in the operation of vehicles would hardly be consistent with using mechanics for signaling and other ground operations. Moreover, the interrelatedness of the various dispatch activities was acknowledged, as a matter of tactics, in TWA's letter of October 23, 1984.

Most significantly, TWA's unilateral adoption of powerback procedures at mechanic-staffed stations with ramp servicemen performing attendant ground functions gives the company leverage in negotiation in its efforts to have the unions agree to the pushout contract modification. By asserting a right to employ powerback and thereby take receipt and dispatch work away from the mechanics, the company greatly weakens the unions' bargaining position on the pushout issue. If the unions maintain their insistence that pushout re-

---

ing period. The statute and the *Shore Line* case make it clear that special protection for the status quo exists during a negotiating period, regardless of whether there may be a concurrent dispute over the interpretation of a contract. Moreover, unlike the situation in *Northwest Airlines,* the crisis was initiated here by a deadlock in bargaining over new contract language concerning "pushouts" rather than by an interpretation dispute that led to a bargaining notice.

**8.** By citing the *O'Donnell* ruling for the proposition that a contract dispute does not negate the existence of a major dispute, if unilateral action is threatened during a negotiating period, the court does not suggest agreement with the *O'Donnell* court that resolution of the contract dispute by the Adjustment Board must proceed

during negotiations, and will authorize modification in the Section 6 injunction. Such a procedure, though possibly desirable as a matter of policy, does not seem to me to be contemplated by Section 6, as interpreted in *Shore Line.* In *Shore Line* the railroad had obtained a Board of Adjustment ruling that the collective agreement did not prohibit it from establishing outlying assignments (396 U.S. at 145–6, 90 S.Ct. at 296–97), yet the Supreme Court held that making such assignments was contrary to the status quo requirements of Section 6 because the assignments had become a subject for negotiation. In this sense the court agrees with the comment by the Eighth Circuit in *Burlington Northern* that the courts should not treat a controversy as a "hybrid". 458 F.2d at 356.

main exclusively a mechanic's function (as it has been in every IAM–TWA agreement since 1970), TWA can point to the powerback changes as an alternative means to reassign a significant portion of receipt and dispatch work to ramp servicemen. Implicit in the unilateral imposition of powerback is the asserted authority to get indirectly what TWA desired to achieve directly through the negotiations—to take job tasks away from the mechanics. TWA's actions have the effect of telling the plaintiffs—we can displace mechanics by using powerbacking for certain types of aircraft so it is futile for you to oppose the pushout contract change. It is precisely this kind of change in working conditions and assignments during the negotiation period that violates the letter and spirit of the Act's status quo provisions. The leverage that the company would achieve in the labor negotiations by adopting its powerback dispatch option demonstrates the very close relationship between the pushout and powerback issues.

There is little doubt that in the present case, unlike the situation presented in *International Federation of Flight Attendants v. Trans World Airlines, Inc.*, 655 F.2d 155 (8th Cir.1981), the airline is altering an established practice and custom at mechanic-staffed stations relating to the use of mechanics as ground crews in dispatch operations. Furthermore, contrary to the facts presented in the *IFFA* case, it is my finding here that the changes pertaining to powerback are closely linked to the parties' contract negotiations.

■ On the other hand, the change in "walk-around" and "logbook check" assignments seems clearly unrelated to the "receipt and dispatch" controversy or to any other subject of negotiation. The possible furlough of two mechanics in the TWA system does not rise to the level of a "major dispute," using the "pragmatic" approach recommended by the unions and referred to in some of the decisions. *Local 553, Transport Workers Union v. Eastern Airlines, Inc.*, 695 F.2d 668, 673–4, 676 n. 8 (2d Cir.1982); *Air Line Pilots Ass'n. v.*

*TWA*, 713 F.2d 940, 948 (2d Cir.1983), *appeal pending.* If there is a violation of contract obligations, however, the Railway Labor Act offers relief through minor dispute resolution.

The court therefore characterizes the powerback dispute as a major dispute and the walk-around and logbook check disputes as minor.

Plaintiffs are not entitled to a status quo injunction, however, unless they are seeking to preserve the status quo. TWA contends the status quo should be ascertained from the July, 1983, letter, advising that powerback operations would be expanding through the system. There is no evidence, however, that powerback operations were in fact being continuously phased in through the entire period from July, 1983, to the date of the notice in November, 1984. On the contrary, all indications are that TWA had "frozen" its powerback activity, and a change of practice did not begin at stations where mechanics were employed until December, 1984. The period of inactivity seems to have included all of 1984, and may have begun in 1983. During a portion of the period TWA seems to have been motivated by the hope that agreement could be reached with the unions. The lengthy pause in unilateral action was consistent with the negotiating practices favored by the Railway Labor Act, and solidifies the status quo that is mandated by Section 6.

Whether or not TWA now has good cause for impatience, the unions are entitled to a court order requiring maintenance of the status quo with respect to powerback work reassignments and furloughs.

### "MINOR DISPUTE" ANALYSIS

■ The court acknowledges that the lesson it draws from the *Shore Line* case seems not to have been previously recognized in this circuit, and there is language in some of the cases, particularly *Burlington Northern* and *Northwest Airlines*, that arguably cuts against the ruling that the powerback dispute is a major one, requiring Section 6 relief. If the powerback

furlough dispute were characterized as a minor dispute, because there is a contract dispute as well as a dispute arising from negotiations, the court would be required to examine the equities before granting relief staying pertinent furloughs pending arbitration. The only equitable defense that requires consideration is the claim that legal remedies are adequate. The court concludes, however, that a sufficient showing of irreparable harm has been made, on behalf of the mechanics represented by plaintiffs who would be displaced by reassigned ground crew work during powerbacking, so that relief should be granted even if the appellate court concludes the dispute is a minor one.[9]

At the suggestion of the court, the parties have briefed the applicability of the Supreme Court's decision in *Sampson v. Murray*, 415 U.S. 61, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974) to the injunctive issues in this case. This court has previously found itself restricted by the *Sampson* case. E.g., *Nelson v. Baldridge*, 578 F.Supp. 320 (W.D.Mo.1984). At least two federal decisions apply *Sampson* to preliminary injunction analysis in Railway Labor Act cases. *Local 553, TWU v. Eastern Air Lines, Inc.*, 695 F.2d 668, 677–8 (2d Cir. 1982); *IBFO v. Consolidated Rail Corp.*, 560 F.Supp. 169 (S.D.Ohio 1982) (Duncan, J.). Judge Duncan in turn relies upon an unreported ruling by Judge Rogers in the District of Kansas (Topeka), as well as *Sampson*, in denying preliminary relief, surmising that the rights of terminated workers will be adequately redressed by an order for reinstatement and back pay in arbitration. While acknowledging that "the question is close", Judge Newman's opinion in *Local 553* affirms a finding of irreparable harm, so as to justify a preliminary injunction pending further negotiations in a "major dispute".

It may be technically ruled that none of the above cases is applicable to the analysis of irreparable harm in the present case, where the case has reached finality and all evidence has been presented. Reinstatement of employees and preservation of group job rights is commonly granted at the final stage of a proceeding in which terminations have been ruled unlawful. If the powerback controversy were to be submitted to arbitration, however, the protective order here requested will serve the same function as a preliminary injunction, and the court will therefore view the proof of inadequacy of legal remedies somewhat more critically than in the normal permanent injunction case.

Allowing TWA to proceed with furloughs will seriously impact on the lives of 180 to 225 employees who will either be furloughed or "bumped" by furloughed employees. The affected employees cannot now be readily identified. The proof satisfies the court, however, that there will be serious disruption of family life among some of the employees, a significant number of residential relocations to save job rights, family separations, forced sale of homes with unpredictable financial losses probably not compensable in arbitration, and great difficulty in identifying and evaluating the multiple losses incurred. Labor unrest will be invited, contrary to the purposes of the Railway Labor Act,[10] and the unions will suffer some loss of credibility during a critical negotiating period.

The irreparable losses may be compared with those held to justify relief, despite *Sampson*, in an Eighth Circuit case. *Oglala Sioux Tribe of Indians v. Andrus*, 603 F.2d 707, 712–3 (8th Cir.1979) (injunctive relief authorized pending administrative review of removal of Superintendent of an Indian agency). In the labor context, mul-

---

9. The court finds the proof insufficient to conclude that the modified work assignments relating to walk-around inspections and logbook checks will result in irreparable harm.

10. Defendant picks up and elaborates on a comment by the court during the hearing that judicial remedies should not reward a party for

threatened violence or illegality. The Railway Labor Act, however, is designed, in part, to create conditions alleviating unrest; the statute therefore legitimates the issues mentioned by plaintiffs. The court further assumes good faith and law-abiding intent by plaintiffs' officials.

tiple employee losses through default of some mortgages and lapse of medical insurance have been held to justify relief by preliminary injunction. *Truck Drivers, Oil Drivers, etc., Local 705 v. Almarc Manufacturing, Inc.,* 553 F.Supp. 1170 (N.D.Ill. 1982); *Gonzalez v. Chasen,* 506 F.Supp. 990, 997–999 (D.P.R.1980); *American Federation of Government Employees, Local 1858 v. Callaway,* 398 F.Supp. 176, 186, 193–4 (N.D.Ala.1975). See also *Whelan v. Colgan,* 602 F.2d 1060, 1062 (2d Cir.1979) (loss of medical coverage during litigation "obviously raised the spectre of irreparable injury"); *Local Lodge No. 1266, IAM v. Panoramic Corp.,* 668 F.2d 276, 286–7 (7th Cir.1981) (preliminary injunction against employee displacement by sale of business). It is clear that in a meritorious labor controversy the courts often grant preliminary injunctive relief in order to avoid the potential later problems of "unscrambling eggs".

Insofar as Judge Duncan's ruling and the unreported ruling of Judge Rogers may be to the contrary, I decline to follow them; it is believed, however, that those cases may simply exemplify instances of insufficient proof and possible failure to emphasize the special problems arising when substantial numbers of employees are affected. In both cases, moreover, the union was seeking mandatory rather than preventive relief in that the employees had already been laid off. Relief is less disruptive and more often granted when it is possible to freeze a status quo.[11]

## JUDGMENT

The Clerk will enter judgment in favor of plaintiffs and against defendant on Count I and in favor of defendant on Count II of the complaint. Relief is denied on Count III as being unnecessary except in the event of a reversal. Defendant is enjoined from furloughing mechanics in order to substitute ramp servicemen as ground crews during powerback departures, and is further enjoined from continuing to reassign such work from mechanics to ramp servicemen, where such reassignments have been made or would otherwise be made pursuant to the notice given November 30, 1984. Jurisdiction is retained to modify or clarify this Order.

---

11. The court realizes, of course, that TWA contends that a freezing of excessive costs is inherent in an injunction against furloughs. The high priority given to labor peace in the transportation industry may be criticized as a matter of policy, particularly during a period of dereg-

ulation, increased competition and less public reliance on the services of a single carrier. The action taken by the court is, however, deemed to be consistent with the objectives of the Railway Labor Act.